**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

LOANDEPOT.COM, LLC,                          :
                                             :
        Plaintiff,                       :
                                             :
     v.                                  :  Case No. _____
                                             :
MOVEMENT MORTGAGE, LLC,                      :
                                             :
        Defendant.                       :
                                             :

## COMPLAINT

Plaintiff loanDepot.com, LLC ("loanDepot" or "Company"), by counsel, submits this Complaint against Defendant Movement Mortgage, LLC ("Movement"), and in support states the following:

## NATURE OF THE ACTION

1.     Fair competition for qualified employees is a cornerstone of the nation's economy. However, inducing individuals to breach contractual prohibitions against employee solicitation and misuse of confidential information in order to steal business and customer relationships crosses the line into unfair competition.  Movement has crossed that line again and again, through its unlawful poaching of over 25 employees during just three months, effectively crippling certain of the Company's now-depleted branches and substantially damaging their business.  Movement's targeted recruiting and hiring of Company employees has gone beyond mere market coincidence, and, instead, was designed to (a) take loanDepot's trade secrets and confidential information; (b) induce former loanDepot employees to violate their contracts with the Company by breaching restrictive covenants prohibiting the former Company employees from soliciting loanDepot employees to leave loanDepot; and (c) induce those loanDepot employees to breach their fiduciary

duties and duties of loyalty to loanDepot.  Movement's choreographed misconduct has broken the law.[1]

2.      loanDepot seeks damages and permanent injunctive relief against Movement for its misappropriation of loanDepot's trade secrets, aiding and abetting breaches of fiduciary duty, unfair competition, unjust enrichment, unfair trade practices, and tortious interference with loanDepot's contracts and prospective economic advantage.

3.      loanDepot and Movement are competitors in the business of making home mortgage, home equity, and personal loans.  loanDepot employed numerous loan officers across the United States, including: Sean Johnson (Virginia), John DePaul (Pennsylvania), Joseph Kunzig (Pennsylvania), Anthony Rizzello (Pennsylvania), Kevin Luchko (Pennsylvania), and Clay Higgins (Florida) (collectively, the "Former Employees").  loanDepot invested in these Former Employees.  It provided them with years of training, customer and referral source introductions and leads, access to loanDepot's confidential and trade secret information, and thousands of dollars in expense reimbursements.  They were also handsomely compensated for their work.  In return, the Former Employees entered into agreements with loanDepot which include certain narrow covenants which governed their conduct during, and governed or govern their conduct after, their employment.  These covenants include a provision restricting the use and disclosure of loanDepot confidential information and an employee non-solicitation provision.

4.      Movement knew of these contractual restrictions, but willfully induced these employees to flout them.  Movement has also engaged in numerous acts of unfair competition designed to decimate numerous loanDepot branches.

---

[1] loanDepot has commenced arbitrations against certain of these former employees pursuant to binding arbitration agreements and these proceedings remain ongoing.

66288/0001-45584673

5.      For example, over a three-day period in late October 2021, Movement and Sean Johnson orchestrated a six-employee resignation from loanDepot's Fairfax, Virginia branch ("Fairfax Branch").  For weeks preceding the resignations, Movement worked closely with Johnson to facilitate the departure, including by encouraging Johnson and others to solicit their colleagues in breach of their contractual commitments to loanDepot.  This included an all-expense paid recruiting trip facilitated by Movement and Johnson.

6.      Then, mere days later, on November 1, 2021, loanDepot employees John DePaul, Joseph Kunzig, and Anthony Rizzello (along with three colleagues) resigned in rapid succession over the course of an hour from loanDepot's Plymouth Meeting, Pennsylvania Branch ("Plymouth Meeting Branch").  This, too, was pre-meditated and coordinated with Movement.

7.      In the following weeks, Movement then coordinated with loanDepot employee Clay Higgins to execute yet another group departure in Florida.  Movement and Higgins worked together to recruit loanDepot employees—all while Mr. Higgins was employed by loanDepot and despite his contractual commitments and fiduciary obligations—including inviting loanDepot employees to attend an all-expenses-paid trip to Movement's headquarters in South Carolina. Their efforts succeeded.

8.      In the ensuing weeks, additional loanDepot employees in Florida, Maryland, Washington, D.C., and Delaware all similarly resigned from loanDepot and joined Movement. These resignations were, on information and belief, induced in violation of contractual obligations. To date, several loanDepot branches have been effectively gutted and loanDepot has lost at least 25 employees at the hand of Movement's predatory raiding.

9.      loanDepot learned that, in the weeks leading to their departures, the Former Employees accessed and misappropriated confidential and trade secret documents about

3

loanDepot's business, its employees, and its clients; information that, in the hands of Movement, was used to convert customers to Movement and away from loanDepot.

10.     As is evident from the timing and the nature of the resignations, Movement and the former loanDepot employees strategically coordinated these group resignations from loanDepot, with the Former Employees while they were still employed by loanDepot, in a manner calculated to cause maximum impact, disruption, and harm to loanDepot.

## THE PARTIES

11.     Plaintiff loanDepot.com, LLC is a Delaware limited liability company with its principal place of business in Orange County, California.

12.     Defendant Movement Mortgage, LLC is a Delaware limited liability company with its principal place of business in Indian Land, South Carolina.

13.     Movement competes with loanDepot.

## JURISDICTION AND VENUE

14.     This Court has federal subject matter jurisdiction over Count I, a claim under the Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq. ("DTSA").  *See* 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the other counts because they form part of the same case or controversy as Count I.  *See* 28 U.S.C. § 1367.

15.     Venue is proper in this Court under 28 U.S.C. §1391(b)(1) because Defendant is a Delaware limited liability company.

## FACTUAL ALLEGATIONS

### The Business

16.     loanDepot is a nationwide residential-mortgage lender licensed in all 50 states.  It has grown to become one of the largest retail mortgage loan originators in the country since its inception in 2010.

4

17.     loanDepot prides itself on its proprietary, cutting-edge technology that provides a safe software platform for consumers to securely transfer their private income, employment, credit, tax, and asset information.

18.     Movement, founded in 2008, is also a nationwide residential-mortgage lender licensed in all 50 states.  Movement employs a team of about 4,500 employees and has loan officers in over 775 locations nationwide.

**loanDepot Aggressively and Diligently**
**Protects Its Confidential and Trade Secret Information**

19.     By virtue of their positions at loanDepot, the Former Employees were entrusted with volumes of non-public, personal information of customers, applicants, and borrowers protected by federal and state laws and regulations, which may not be disclosed to third parties, and which may be used only for narrowly prescribed purposes.

20.     This information includes compilations of customer and consumer names, addresses, personal identifying information, and financial information.

21.     The Former Employees had access to loanDepot's custom-developed and proprietary training materials; job aids; and supplier, vendor, and referral source information.

22.     Customer privacy, and the non-disclosure of confidential customer information, are important to loanDepot, and loanDepot would be seriously harmed by the breach of customer privacy or unauthorized disclosure of their confidential information.

23.     In addition, as licensed mortgage loan originators, the Former Employees had to comply with the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801-6809 ("GLBA"), which governs the treatment of confidential, nonpublic information of consumers by financial institutions, along with comparable state laws and regulations governing consumer privacy.

5

24. To ensure compliance with these laws and regulations, loanDepot safeguards its data, information systems, and consumer and employee information, with a sophisticated and elaborate Information Security Program ("ISP") governed by a written Information Security Policy, updated as of July 8, 2020.

25. According to the ISP, these activities are strictly prohibited: (a) accessing data, a server, or an account for any purpose other than conducting Company business, even if the employee has authorized access; (b) sharing Company information with non-approved parties outside the Company; and (c) storage of Company information in non-Company managed locations such as personal drives, personal cloud storage, and devices.

26. loanDepot also has an Employee Handbook, which is available on loanDepot's intranet and accessible to employees at any time.

27. The Former Employees acknowledged that they received, read, and agreed to comply with the policies in the Employee Handbook.

28. The Employee Handbook includes or incorporates by reference these pertinent policies:

      a.     A "Confidential and Consumer Information" policy, which states: "[T]he Company has placed special emphasis on the appropriate collection, storage and use of customer information.  Your role in privacy protection is critical."

      b.     The ISP Policy, referenced above.

29. loanDepot also has a Mobile Device Management Policy available on the loanDepot intranet.  All loanDepot employees, including the Former Employees, are expected to comply with this policy.

30. The Mobile Device Management Policy includes extensive provisions designed to protect information communicated or received on mobile devices, including these provisions:

6

a.      "All sensitive information should be stored on the loanDepot network servers.  This step ensures that data is secure and automatically backed up."

b.      "Do not move information from one mobile device to another mobile device via side loading (airdrop).  Instead, transfer information using company networks and/or approved methods of sharing company information."

c.      "Never copy sensitive data to the local drive on the notebook/mobile device."

d.      "All loanDepot data that is stored on the mobile device must be secured using loanDepot-mandated physical and electronic method at all times. Users must comply with physical security requirements at all times."

e.      "Saving or transferring company data from an approved mobile device to non-approved storage is strictly prohibited."

### The Former Employees' Incentive Agreements

31.     loanDepot requires its employees to sign written agreements containing confidentiality and non-disclosure provisions designed to protect and safeguard its confidential information, trade secrets, and loanDepot's assets.

32.     Relevant here, the Former Employees each signed a "Retail Master Incentive Plan" ("Incentive Agreement"), which (a) prohibits the solicitation of loanDepot's employees; (b) prohibits the disclosure, unauthorized use, transfer, or removal of loanDepot's confidential and trade-secret information; and (c) requires that the Former Employees return all loanDepot information and property upon the termination of their employment with loanDepot.

33.     The Incentive Agreements are identical in all material respects.  The Former Employees' Incentive Agreements are attached as **Exhibits A-F**.

34.     In the Incentive Agreements, the Former Employees are each referred to as the "Participant."

35.     The Incentive Agreements protect and safeguard loanDepot's confidential, proprietary, and trade secret information:

7

Participant agrees that, while employed by the Company [and] at any time thereafter, <u>Participant will keep strictly confidential and will not, directly or indirectly, disclose to any person or entity or use for the benefit of Participant or any other person or entity any "Confidential Information,"</u> as defined below, that Participant learned, obtained or had access to in the course of or as the result of Participant's employment with Company or using Company's systems, access means or computing or mobile devices.  Participant agrees, at all times, to take appropriate and reasonable steps to safeguard Confidential Information and to protect it against disclosure, misuse, unauthorized access, espionage and theft.

<u>"Confidential Information" means information and materials</u> in any medium learned, obtained or accessed by Participant because of or through his or her employment with Company, or using Company's systems, access means or computing or mobile devices, <u>about Company's</u> business, prospects, plans and operations, products, processes, methods of doing business, systems, <u>databases</u> and technology, inventions and other intellectual property, loan origination and <u>marketing practices</u>, training, services, <u>and Customers</u> (as defined herein) and that is not known or readily available through proper and lawful means to the general public as well as Customer data.  <u>"Customers" mean… visitors or registrants to Company websites, leads, callers to Company call centers, loan or prequalification or preapproval applicants (whether or not a loan is approved or closed or denied), and loan customers, in each case, past, present and future</u>….

<u>Participant agrees that he or she will return any such Confidential Information and property to Company upon the termination of Participant's employment</u> or at any other time promptly upon the request of Company and that <u>Participant will not share, copy, transmit, or use such Confidential Information or property</u> except only to the extent required solely for and in the course of Participant's employment by Company….

<u>Upon termination of Participant's employment</u> for any reason, or upon receipt of written request from Company, <u>Participant shall immediately deliver to Company all tangible and intangible property</u> (including computers, computing devices, cell phones, memory devices, files, data downloads and any other tangible item), drawings, notes, memoranda, specifications, devices, notebooks, formulas and documents, together with all copies of any of the foregoing, and any other material containing, summarizing, referencing, or incorporating in any way or otherwise disclosing any work product or Company materials.

*See* **Exs. A**-**F**, Section VI (A) (1), (2), (4), and (5) (emphasis added).

36.     The Incentive Agreements also protect loanDepot's investment in its employees:

> Non-Solicitation.  To the fullest extent permitted by applicable law, Participant agrees that he or she will not, while in the employment of Company and for a period of one (1) year after the termination of that employment regardless of reason, solicit or induce, directly or indirectly, whether on his or her own behalf, working with or through others, on or behalf of or through any other person, business or entity, an employee or independent contractor of Company to terminate or breach his or her employment or contractor relationship with Company or apply for employment or a contractor relationship with any person, business or entity.

*See id.*, Section VI (B) (emphasis added).

37.     The Former Employees, with assistance from Movement, breached their Incentive Agreements, including the confidentiality and non-solicitation obligations to loanDepot.

## The Virginia Employees

38.     After nearly four years of employment with loanDepot in a variety of key management positions, including licensed Mortgage Loan Office ("MLO"), Branch Manager, and then, most recently, Area Sales Manager in charge of the sales of multiple branches, Mr. Johnson started planning his departure to Movement.

39.     In mid-September 2021, Movement invited Mr. Johnson to the Carolinas on an all-expenses-paid recruiting trip.

40.     On October 5 and 7, 2021, mere weeks before the mass resignations, Movement's President Mike Brennan exchanged text messages scheduling a phone call with Mr. Johnson.

41.     On October 7, 2021, Mr. Johnson also emailed himself loanDepot market and recruiting information.  This included a chart that quantifies regional loan data, and identifies markets for opportunity and growth, as well as an outline of criteria for hiring loan officers, sales managers, and branch managers, in various territories across the region.

42.     Upon information and belief, Mr. Johnson transferred these documents to his personal email, after he was engaged in talks with Movement's President, for both his own and Movement's benefit; and further, for negotiation of the terms of Mr. Johnson's employment with Movement and for recruiting additional loanDepot employees.   This includes Mr. Johnson's transfer of emails regarding: market and recruiting data, which detail strategy and identify top producers and opportunity for growth; financial data, including branch production and revenue; loans suspended or delayed; and a list of funded loans.

43.     On October 11, 2021, Mr. Johnson texted Movement's Divisional Leader, Chris Shelton, to discuss the Company's sales volume and revenue production.   Specifically, Mr. Johnson disclosed projections of both his and his team's revenue production and product mix.

44.     The following week, and again, while Mr. Johnson and all of the people he subsequently brought to Movement were still employed by loanDepot, Mr. Johnson took several loanDepot employees to Nashville, Tennessee on a second all-expenses-paid recruiting trip hosted by Movement.

45.     On October 20, 2021, less than a week before the group departure, Mr. Johnson and Mr. Shelton exchanged in salary negotiations via text message.   In that exchange, Mr. Johnson says, "Sumeeth [(another loanDepot employee who joined Movement)] I think wants to come back [to Movement]."   Mr. Johnson also requested that Movement get offers out to his direct team so they could resign simultaneously.

46.     On October 21, 2021, Mr. Johnson and Mr. Shelton again exchanged text messages about a recruiter, including that the "recruiter should not of [sic] been calling that area", and Movement provided Mr. Johnson a list of employees to whom the recruiter had already reached out.

47.     On October 22, 2021, Mr. Shelton texted Mr. Johnson that he would talk with members of Mr. Johnson's team – Greg Roberts and Duke Walker – that afternoon.

48.     In the lead-up to his resignation on October 26, 2021, Mr. Johnson continued to email to his personal email address loanDepot's confidential, trade secret, and consumer-protected information, without authorization, and with the intent to use this information for his benefit as a new Movement employee.  This includes emails regarding market and recruiting data, which detail strategy and identify top producers and opportunity for growth; financial data, including branch production and revenue; loans suspended or delayed; and a list of funded loans.

49.     On October 26, 2021, Mr. Johnson resigned from loanDepot to work for Movement as a Regional Sales Director, approximately 0.3 miles down the road in Fairfax, Virginia from his office with loanDepot.

50.     When asked by his supervisors about his departure, Mr. Johnson stated, "I'm taking my team with me" – an acknowledgment that he recruited them *while he was still employed by loanDepot* and orchestrated their synchronized notices with Movement.

51.     Immediately thereafter, between October 26-28, 2021, six additional employees (and Mr. Johnson's direct reports)—four other MLOs and two Production Assistants ("PA") – from loanDepot's Fairfax Branch submitted choreographed email resignations (some within minutes of each other) to set up shop with Movement.

52.     On October 31, 2021, after the resignations, Mr. Johnson sent a text to Movement Market Leader James Hottle with several screenshots for potential additional recruits.  One of the screenshots included loan volume and other related information regarding Sumeeth Theruvath, a loanDepot Sales Manager in the Fairfax Branch who also left loanDepot for Movement on November 17, 2021.

53.     In addition, loanDepot's subsequent investigation has since revealed that Mr. Johnson took with him to Movement, without loanDepot's knowledge much less authorization, highly sensitive and confidential Company information, including, for example:

a.     On October 11, 2021, Mr. Johnson bcc-ed his personal email address on an email from his loanDepot email address, transferring a request for a pricing exception for a customer with confidential and GLBA-protected information including: the loan number, borrower name, loan amount, interest rate, exception percentage and reason for the pricing exception.

b.     On October 11, 2021, Mr. Johnson bcc-ed his personal email address on an email from his loanDepot email address, transferring documents in support of a suspended loan with confidential and GLBA-protected information including:  consumer name, address, loan amount, loan terms (including note rate), FICO score, LTV, and the reason why the loan was suspended.

c.     On October 25, 2021, Mr. Johnson sent an email from his loanDepot email address to his personal email address, transferring a request for a pricing exception with confidential and GLBA-protected information including: the loan number, borrower name, loan program, loan amount, interest rate, exception percentage, reason for the pricing exception, and the qualifying FICO score.

d.     On October 25, 2021, Mr. Johnson sent an email from his loanDepot email address to his personal email address, transferring to his personal email account an excel spreadsheet that contains a loanDepot customer list associated with a loan officer named Juanita Mitchell (who is currently employed with loanDepot).  The spreadsheet contains confidential and GLBA-protected information about **63 clients** (first and last name, mailing address, phone number(s), and email address), as well as confidential and GLBA-protected information about the loans they sought (the type of loan, loan amount, interest rate, LTV/CLTV%, monthly mortgage insurance, credit score, and the date the loan was funded).

54.     On October 29, 2021, just four days after he transferred the above-described sensitive client information to himself, Mr. Johnson signed an Exit Acknowledgment falsely representing to loanDepot that he returned all of loanDepot's confidential information.

55.     Upon information and belief, Mr. Johnson has used or disclosed, or intends to use or disclose, this confidential and consumer-protected information in his employment with Movement to transfer customers that otherwise would have done business with loanDepot.

56.     In addition, other of Mr. Johnson's team members at the Company emailed to themselves confidential information, including customer loan documents, such as loan approval information, customers' driver's licenses, and closing documents.  For instance, on October 21, 2021- merely ten days before his November 1, 2021 resignation, Justin Kozera, emailed from his loanDepot email address to his personal email address, transferring a client's closing documents, which list the loan number, borrower name, loan amount, interest rate, and loan costs, among other things.  Additionally, Mr. Kozera's chat history with other former loanDepot employees in the following days includes discussion as to whether specific Movement employees handle certain types of loans, as well as closing dates moved to November (when Mr. Kozera began working at Movement) and loan cancellations as there is "obviously" no need to rush.

57.     Upon information and belief, these Johnson team members have also used or disclosed, or intend to use or disclose, this information in their employment with Movement, as part of a team overseen by Mr. Johnson, to take loanDepot customers to the Company's competitive detriment.

58.     To date, Movement has lifted out nearly thirty former loanDepot employees from the Company's Fairfax, Virginia; Ocean City, Maryland; and Washington, D.C. branches.

**The Pennsylvania Employees**

59.     On November 1, 2021, Mr. Kunzig, Mr. DePaul, and Mr. Rizzello resigned from loanDepot and went to work for Movement, at a branch office less than a mile from where they had worked for loanDepot.

60.     Mr. Kunzig, Mr. DePaul, and Mr. Rizzello are three of six employees from loanDepot's Plymouth Meeting Branch who resigned via email within less than an hour on November 1, 2021, to commence employment with Movement.

61.     Four of the employees who resigned, including the Plymouth Meeting Branch Manager Bob Saritsoglou, are MLOs.

62.     This coordinated departure from the Plymouth Meeting Branch followed just days after the coordinated departure of six MLOs from loanDepot's Fairfax Branch.

63.     While they were still employed by the Company, Movement worked with these six loanDepot employees, including Branch Manager, Mr. Saritsoglou, to hatch and implement a scheme to loot loanDepot's business to benefit Movement by soliciting loanDepot's valuable employees to form an entire new team working under the Movement brand and surreptitiously transferring vast quantities of confidential, trade secret, and legally protected information without authorization.

64.     Mr. DePaul, Mr. Kunzig, and Mr. Rizzello negotiated new employment arrangements with Movement in or about the third or fourth quarter of 2021, the terms of which contemplated (a) the solicitation of the existing team of employees at loanDepot's Plymouth Meeting Branch to form a new team at Movement's Plymouth Meeting Branch (only 0.4 miles away, or a short walk); and (b) setting up and implementing a premeditated plan and strategy to divert existing and potential business to Movement before their employment separations.

65.     The transition plan—conceived and executed by Movement and these Former Employees while Mr. DePaul, Mr. Kunzig, and Mr. Rizzello were loanDepot employees and on the Company's payroll—included the following:

(a)     Soliciting fellow loanDepot employees at loanDepot's Plymouth Meeting Branch to terminate their employment with loanDepot on pre-arranged dates;

14

(b)     Copying or transferring confidential, non-public, personal information of applicants and borrowers to personal email accounts in breach of their legal duties to divert the business of those applicants and borrowers to Movement; and

(c)     Copying, transferring, and using loanDepot's confidential, proprietary, and trade secret information, including customer lists, contact lists, lists of active loans in the pipeline, financial data, custom templates, and other confidential information of loanDepot for use in their new employment relationship for their benefit and the benefit of Movement.

66.     Movement and the six loanDepot employees did this to prepare for the diversion of loanDepot's applicants and borrowers to Movement, which is evidenced by the almost immediate transition of their MLO licenses in a publicly available database known as the Nationwide Multistate Licensing System and Registry.

67.     On November 5, 2021, Movement Market Leader Spiro Kontostergios sent an internal email expressing his frustration that Movement's licensing department had not updated its system showing that Mr. Saritsoglu's, Mr. Rizzello's, and Mr. DePaul's MLO licenses had been transferred.  He specifically said, "Sorry to be a pest but they have a lot of loans they are trying to disclose".

68.     Mr. Kontostergios was not satisfied with just six loanDepot employees from the Plymouth Meeting Branch.  As of December 15, 2021, Mr. Kontostergios was recruiting loanDepot MLO Kevin Luchko from loanDepot's Philadelphia, Pennsylvania branch.

69.     Mr. Luchko negotiated a new employment arrangement with Movement in or about December of 2021, while he contemplated setting up and implementing a premeditated plan and strategy to divert existing and potential business to Movement before his employment separation.

70.     The transition plan—conceived and executed while Mr. Luchko was a loanDepot employee and on the Company's payroll—included the following:

(a)     Copying or transferring confidential, non-public, personal information of applicants and borrowers to external storage devices (*e.g.*, USBs) and to personal cloud accounts (including cloud-based spreadsheet software like Google's "Google Sheets") in breach of his legal duties for the purpose of diverting the business of those applicants and borrowers to Movement; and

(b)     Copying, transferring, and using loanDepot's confidential, proprietary, and trade secret information, including customer lists, contact lists, lists of active loans in the pipeline, financial data, and other confidential and trade secret information of loanDepot for his new employment relationship for his benefit and the benefit of Movement.

71.     Yet, Mr. Luchko, as recently as December 2022 – while he was Movement's agent – downloaded a customer compilation to a Movement computer.

72.     Upon information and belief, Mr. Kunzig, Mr. DePaul, Mr. Rizzello, Mr. Saritsoglou, and Mr. Luchko have used and are continuing to use loanDepot's confidential, proprietary, and trade secret information at Movement.

**The Florida Employees**

73.     loanDepot employed Clay Higgins (Producing Branch Manager or "PBM"), Michael Holzum (Sales Manager), Shawn Dunning (Loan Consultant), Scott Miller (Loan Consultant), Samantha Meek (Loan Processor), and Lauren Laughlin (Branch Production Assistant) in the Pinellas County, Florida branch (the "Pinellas County Branch").

74.     In or about late September 2021 and while he was still employed by loanDepot, Movement and Mr. Higgins started to lay the groundwork for his and his colleagues' defections to Movement.

75.     All while he was still employed by loanDepot, Mr. Higgins, with assistance from Patrick Turner (Movement's Market Leader based in Tampa, Florida), began recruiting Mr. Holzum, Mr. Miller, and Mark Raff (another loanDepot Loan Consultant who stayed at loanDepot) to defect to Movement with him.

76.     Movement knew Mr. Higgins was a PBM and that he supervised Loan Consultants and other loanDepot employees.

77.     To solicit Mr. Raff, and as an inducement to leave his employment with loanDepot, Mr. Higgins told Mr. Raff that Movement was offering a $125,000 signing bonus to any loanDepot loan originators to come to Movement.

78.     In or about mid-October 2021, Mr. Turner forwarded Mr. Higgins an email showing how Movement was addressing the recent decline in the loan market and solutions he offered to his employees to address those problems.   Mr. Higgins forwarded this email to Mr. Holzum.   Movement was colluding with Mr. Higgins in his solicitation of loanDepot employees.

79.     On October 22, 2021, Mr. Higgins and Mr. Turner discussed Mr. Higgins' compensation if he came to work with Movement.

80.     Then, in early November 2021, and consistent with Movement's *modus operandi*, Mr. Turner invited Mr. Higgins, Mr. Holzum, and Mr. Raff on an all-expenses-paid trip to Movement's headquarters in the Carolinas, to lure them to work for Movement.

81.     On November 8, 2021, after Mr. Higgins' supervisor discovered he was on this recruiting trip while he was supposed to be managing loanDepot's Pinellas County branch, Mr. Higgins' employment was terminated.

17

82.    Mr. Higgins is now employed as Branch Leader of Movement's Palm Harbor, Florida branch.

83.    Mr. Holzum resigned less than two weeks later on November 18, 2021.

84.    Mr. Miller resigned on March 1, 2022.

85.    Mr. Miller and Mr. Holzum are Loan Officers at Movement's Palm Harbor branch.

86.    Ms. Meek and Ms. Laughlin resigned on January 3, 2022.

87.    Ms. Meek and Ms. Laughlin are employed by Movement as part of its Tampa, Florida team, which includes the Palm Harbor branch.

88.    Ms. Dunning resigned on January 14, 2022.

89.    Ms. Dunning is a Senior Loan Officer at Movement's Lakeland, Florida branch.

## COUNT I
## VIOLATION OF THE DEFEND TRADE SECRETS ACT ("DTSA"),
## 18 U.S.C. §§ 1836 ET SEQ.

90.    loanDepot realleges and incorporates the preceding paragraphs as if set forth fully herein.

91.    The actions of Movement, as described above, constitute violations of one or more provisions of the DTSA.

92.    The DTSA applies because loanDepot's trade secrets are related to products and services used in, and intended for use in, interstate and foreign commerce, which are provided to customers across the United States.

93.    By engaging in the above conduct, Movement misappropriated, threatens to misappropriate, or inevitably will misappropriate loanDepot's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce.

94.    The loanDepot information described above, including the compilations of identities of customers that use loanDepot services, customer information provided by customers

to loanDepot, the identities of prospective customers, the compilations of customer information, employee sales information, lists of active loans in the pipeline, financial data, custom templates, and other confidential information obtained by the Former Employees by virtue of their employment with loanDepot, are trade secrets under the DTSA.

95.     loanDepot expended substantial time, energy, money, and ingenuity in collecting and compiling this information.

96.     loanDepot invests significant time, effort, and financial resources in developing and maintaining its customer relationships, including by, among other things, employing individuals, such as the Former Employees, whose job it is to exclusively develop such relationships, and by allowing employees to expense customer gifts and entertainment to develop such relationships, among other things.

97.     loanDepot has taken reasonable measures to keep the trade secret information secret by, among other things, (1) requiring employees who have access to such information to sign confidentiality agreements; (2) promulgating confidentiality and information security policies; (3) limiting the disclosure and distribution of such information to only employees on a need-to-know basis; and (4) requiring that such information be saved on password protected networks, devices, and servers.

98.     loanDepot's trade secret information is sufficiently secret to derive independent economic value due to not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from the disclosure or use, such as loanDepot's competitors like Movement.

99.     A competitor with access to loanDepot's trade secrets could use that information to target loanDepot's customers, employees, and referral sources.

100.    loanDepot derives significant economic value from maintaining the secrecy of the non-public personal information of borrowers and prospective borrowers, as such information is necessary to process and close home mortgage loans (and refinancing loans)—which is the life blood of loanDepot's business.

101.    Without authorization, Movement, through the Former Employees, misappropriated, threatens to misappropriate, or inevitably will misappropriate these trade secrets in a willful manner and with a deliberate intent to injure loanDepot and benefit Movement for its own financial gain by, among other things, (a) inducing the Former Employees to take loanDepot trade secret information, as described above, including customer lists, contact lists, lists of active loans in the pipeline, financial data, custom templates, and other confidential information; (b) soliciting the Former Employees to Movement, a competitor of loanDepot, and hiring them to perform identical services to those previously provided to loanDepot, including servicing, attempting to service, or threatening to service the same customers, and by using and disclosing, or threatening to use or disclose, or inevitably using or disclosing, without loanDepot's consent, loanDepot's trade secret information in doing so; and (c) acquiring, receiving, or possessing, or inevitably acquiring, receiving, or possessing the trade secrets, knowing same to have been misappropriated without loanDepot's authorization, and using same (including insider information they acquired about loanDepot customers) to convert customers from loanDepot to Movement.

102.    The Former Employees owed duties to loanDepot to maintain the secrecy of the trade secrets and to limit their use of the trade secrets.

103.    Movement acquired the trade secrets by improper means and disclosed and utilized the trade secrets, or inevitably will disclose and utilize the trade secrets, without loanDepot's consent, to perform competitive services and poach Company customers and employees.

104.    The Former Employees are agents of Movement, and are using or disclosing loanDepot's trade secrets in the course and scope of their employment with, and for the benefit of, Movement.

105.    loanDepot communicated the trade secrets to the Former Employees in confidence.

106.    At the time of disclosure, Movement knew or should have known that the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and limit the use of the trade secrets.

107.    Movement will obtain economic value from the disclosure and use of loanDepot's trade secrets, for example, by avoiding the years, and millions of dollars in investment, that it took loanDepot to develop the trade secrets, and to convert loanDepot customers and employees to Movement for its own financial gain.

108.    As a direct and proximate result of the conduct of Movement, loanDepot is entitled to actual damages in an amount to be determined at trial, and permanent injunctive relief.

109.    The acts and conduct of Movement were willful and malicious, justifying an award of exemplary damages and attorneys' fees.

## COUNT II
### UNFAIR COMPETITION

110.    loanDepot realleges and incorporates the preceding paragraphs as if set forth fully herein.

111.    Throughout their employment with loanDepot, the Former Employees gained access to critically important, unique and valuable confidential information.

112.    This information about loanDepot and its employees, customers, lists of active loans in the pipeline, financial data, custom templates, and other confidential information was not

66288/0001-45584673

available to loanDepot's competitors or to the public, and Movement would not have had access to such information but for the Former Employees' employment with loanDepot.

113.    Through the conduct described, namely Movement's use of confidential information for its own advantage, Movement's actions have fallen below the minimum standard of fair play and dealing acceptable in the commercial arena and thus constitutes unfair competition.

114.    Movement is enjoying or will enjoy the benefits of its unfair competition.

115.    Unless permanently enjoined, Movement will continue to misuse confidential information wrongfully obtained from loanDepot to harm loanDepot's business reputation, to divert loanDepot's employees and business to Movement, and to gain an unfair competitive advantage.

116.    By reason of Movement's acts of unfair competition, loanDepot has sustained, and will sustain, loss of the value of its business, loss of good will, loss of revenue and other monetary damages in an amount to be determined at trial.

**COUNT III**
**UNJUST ENRICHMENT**

117.    loanDepot realleges and incorporates the preceding paragraphs as if set forth fully herein.

118.    loanDepot conferred upon the Former Employees the benefit of its confidential and consumer-protected information along with exposing them to its employment and customer relationships.

119.    By inducing the Former Employees to take, transfer, disclose, and use loanDepot's confidential and proprietary information, materials, and trade secrets without authorization for Movement's own use and benefit, Movement has unjustly enriched itself at loanDepot's expense.

120.    Under the circumstances as alleged above, it would be inequitable for Movement to retain the benefits of its outrageous actions without paying for their value, in an amount to be determined at trial.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH CONTRACT**

121.    loanDepot realleges and incorporates the preceding paragraphs as if set forth fully herein.

122.    loanDepot is a party to the Incentive Agreement which are valid contracts with the Former Employees.

123.    Upon information and belief, Movement was aware of the Agreements from times preceding the breaches thereof.

124.    The Former Employees breached their Incentive Agreements with the Company.

125.    Movement permitted and encouraged the breaches of the Agreements, and intentionally and without justification induced the breaches with malicious intent, through improper means, and for an improper purpose.

126.    As a direct result, loanDepot suffered actual damages in an amount to be determined at trial.

**COUNT V**
**INTENTIONAL INTERFERENCE WITH**
**PROSPECTIVE CONTRACTUAL RELATIONS**

127.    loanDepot realleges and incorporates the preceding paragraphs as if set forth fully herein.

128.    loanDepot has and had protectable prospective business relationships with all of the loanDepot employees that left loanDepot for Movement, as well as the customers that Movement

23

solicited/induced or attempted to solicit/induce to leave loanDepot (the "Prospective Business Relationships").

129.    loanDepot had a reasonable expectation that: (1) its employees would continue their employment with loanDepot; and (2) its customers would continue utilizing loanDepot for its services.

130.    loanDepot would have had greater likelihood of prospective contractual relations with the Prospective Business Relationships, absent improper interference.

131.    At all relevant times, Movement knew of the Prospective Business Relationships.

132.    Movement, without any privilege or legal justification, permitted, encouraged or induced loanDepot's customers and employees to desist from pursuing or continuing business relationships with the Company by their acts described above, and have thereby interfered with loanDepot's prospective contractual relations.

133.    Movement's actions, described herein, were done purposefully, intending to harm, and with malicious and unjustifiable intent, through improper means, including obtaining through the Former Employees the benefit of loanDepot's confidential information,  and for an improper purpose, including obtaining business that loanDepot otherwise would have maintained.

134.    As a direct and proximate result of the above activities, loanDepot has suffered and will continue to incur actual damages, including, but not limited to, lost business, lost profits, and the costs of hiring and retaining former and new employees, among other things.

135.    Movement interfered with loanDepot's expectancy in those Prospective Business Relationships, causing damage to loanDepot in an amount to be determined at trial.

136.    Punitive damages and attorneys' fees are warranted due to the malicious nature of the above conduct.

## COUNT VI
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES

137.    loanDepot realleges and incorporates the preceding paragraphs as if set forth fully herein.

138.    Movement knew or should have known that the Former Employees each owed a duty of loyalty to the Company.

139.    The Former Employee's conduct breached their duty of loyalty to loanDepot.

140.    Movement caused the Former Employees to breach their respective fiduciary duties.

141.    Because of the Movement's conduct, loanDepot has suffered damages and loss, in an amount to be determined at trial.

## COUNT VII
### VIOLATION OF SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. § 39-5-10, ET SEQ.

142.    loanDepot realleges and incorporates the preceding paragraphs as if set forth fully herein.

143.    Movement is engaged in "trade" or "commerce" within the meaning of those terms as used in Section 39-5-10(b) of the South Carolina Code.

144.    The above wrongful conduct by Movement constitutes unfair and deceptive acts and practices in the conduct of trade or commerce and, therefore, violates Section 39-5-20(a) of the South Carolina Code.

145.    Movement acted willfully because Movement knew or should have known that its conduct violated Section 39-5-20(a) of the South Carolina Code.  Movement is based in South Carolina, and, upon information and belief, the decisions made as to the Former Employees were either made from, or ratified by, Movement's executives in South Carolina.

146.    These unfair and deceptive acts and practices hurt the public interest because, among other reasons, they are capable of repetition.

147.    loanDepot has suffered actual damages as a direct and proximate result of these unfair and deceptive acts and practices.

148.    loanDepot is entitled to judgment against Movement for the amount of its actual, general, compensatory, incidental, special, and consequential damages in an amount to be determined at trial.

149.    Because Movement's conduct was willful, loanDepot is entitled to an award of three times its actual damages.

150.    loanDepot is further entitled to recover its reasonable attorneys' fees and costs under Section 39-5-140 of the South Carolina Code.

## PRAYER FOR RELIEF

**WHEREFORE,** loanDepot demands judgment against Defendant as follows:

1.    An Order permanently enjoining Defendant from using or otherwise disclosing any of loanDepot's Confidential Information, as defined in the Incentive Agreement, and trade secrets;

2.    An Order requiring Defendant to return to loanDepot, and destroy all copies of, loanDepot's Confidential Information, as defined in the Incentive Agreement, and trade secrets;

3.    An Order awarding loanDepot its actual and exemplary damages (including, for willful and malicious misappropriation, double actual and unjust enrichment damages under 18 U.S.C. § 1836(b)(3)(C) and, for unfair trade practices, an award of three times its actual damages under S.C. Code Ann. § 39-5-140), in an amount to be determined at trial;

4.    An Order awarding loanDepot its pre- and post-judgment interest as allowed by law, as well as its attorneys' fees and costs for this action (including attorneys' fees and costs under

18 U.S.C. § 1836(b)(3)(C) and attorney's fees and costs under S.C. Code Ann. § 39-5-140 for unfair trade practices); and

     5.     An Order awarding any other available damages, including punitive damages and such other and further relief as the Court deems just and proper.

|  | **COLE SCHOTZ P.C.** |
|---|---|
| <u>Of Counsel:</u> | |
| | <u>/s/ Andrew L. Cole</u> |
| Matthew J. Hank (*pro hac vice* forthcoming) | Andrew L. Cole (No. 5712) |
| LITTLER MENDELSON, P.C. | 500 Delaware Avenue, Suite 1410 |
| 1601 Cherry Street, Suite 1400 | Wilmington, DE 19801 |
| Philadelphia, PA 19102 | (302) 652-3131 (Phone) |
| 267-402-3000 (Phone) | (302) 652-3117 (Fax) |
| mhank@littler.com | acole@coleschotz.com |
| | |
| Paul J. Kennedy (*pro hac vice* forthcoming) | *Attorneys for Plaintiff,* |
| LITTLER MENDELSON, P.C. | *loanDepot.com, LLC* |
| 815 Connecticut Avenue, NW, Suite 400 | |
| Washington, DC 20006.4046 | |
| 202-842-3400 (Phone) | |
| pkennedy@littler.com | |

Dated: <u>June 22, 2023</u>

66288/0001-45584673