1201 North Market Street
20th Floor
Wilmington, DE 19801
www.connollygallagher.com



Lauren DeLuca

**DIRECT DIAL**: (302) 757-7312
**DIRECT FAX**:  (302) 757-7298
**EMAIL**:      ldeluca@connollygallagher.com

May 28, 2024

**VIA ECF & HAND DELIVERY**

Hon. Christopher J. Burke
U.S. District Court for the District of Delaware
844 N. King Street
Unit 28, Room 2325
Wilmington, DE 19801-3555

    Re:    *loanDepot.com, LLC v. Movement Mortgage, LLC,*
            C.A. No. 23-0681-MN

Dear Judge Burke:

Movement Mortgage, LLC ("Movement") submits this letter in furtherance of the Parties' Joint Discovery Dispute Letter (D.I. 65), and consistent with the referral of this dispute to Magistrate Burke. (D.I. 67). Movement seeks: (1) to compel the deposition of John Bianchi ("Bianchi"); and (2) a protective order relieving Mike Brennan ("Brennan") and Jason Stenger ("Stenger") of the obligation to sit for a deposition. Movement no longer seeks a protective order for Alison Dresnek or to compel a document production before the 30(b)(6) deposition because the parties have resolved these issues.

### 1. Movement Motion to Compel Deposition of John Bianchi

One of Movement's many defenses to this lawsuit is that many of loanDepot's internal policies and procedures led to employee dissatisfaction and a desire to seek alternative employment. So there are other reasons why multiple employees left loanDepot, or would have left loanDepot quickly even if they did not resign and join Movement Mortgage. One of those problematic practices involved loanDepot's scheme to unlawfully reduce commissions in violation of federal lending laws. One way loanDepot accomplished this was to force employees to falsify documents to create a cover to conceal these practices from federal regulators. Movement seeks Bianchi's deposition because according to the evidence, he was a chief architect of and/or implemented these practices. Other witnesses – including loanDepot's corporate designee in its arbitration against Sean Johnson – specifically identified Mr. Bianchi as having relevant information of these practices, which appear (unsurprisingly) to be largely unwritten.



  Regulation Z of the Truth in Lending Act prohibits payments to loan originators based on any term of the transaction and/or profitability of the loan. 12 CFR § 1026.36 (d).[1] The rule also prohibits any change in the compensation to an originator – even with the Originator's agreement – based on a change to that loan's profitability. 12 CFR Comment §1026.36 (d) (1)-5 provides that:

> "a creditor and a loan originator may not agree to set the loan originator's compensation at a certain level and then subsequently lower it in selective cases (such as where the consumer is able to obtain a lower rate from another creditor). When the creditor offers to extend credit with specified terms and conditions (such as the rate and points), the amount of the originator's compensation for that transaction is not subject to change (increase or decrease) based on whether different credit terms are negotiated. For example, if the creditor agrees to lower the rate that was initially offered, the new offer may not be accompanied by a reduction in the loan originator's compensation. Thus, while the creditor may change credit terms or pricing to match a competitor, to avoid triggering high-cost mortgage provisions, or for other reasons, the loan originator's compensation on that transaction may not be changed for those reasons."

  To circumvent these well-known laws, loanDepot had an unwritten policy of requiring loan officers to falsify documents suggesting that their loans were transferred to others within the company. For instance, when a pricing exception was required to close a loan, loanDepot forced loan officers to receive less commission and falsify forms to provide an excuse justifying the reduction.

  One strategy involved so-called transfers to internal loan consultants ("ILC"). Loan officers would need to submit forms falsely reflecting that they transferred the loan to an ILC and provide one of five listed reasons, other than pricing. *See* Permitted Loan Transfer Form attached as Ex. 1. If employees did not submit the form or admitted the transfer was as a result of loan pricing concessions, they received no compensation as opposed to receiving reduced commissions. *See* Email from Michelle Alexander, attached hereto as Ex. 2.[2] Another scheme to circumvent

---

[1] *See* Official Interpretation of 12 CFR comment 1026.36 (d) (1) -2 ("The rule prohibits compensation to a loan originator for a transaction based on, among other things, that transaction's interest rate, annual percentage rate, collateral type ... or the existence of a prepayment penalty. The rule also prohibits compensation to a loan originator that is based on any factor that is a proxy for a term of a transaction").

[2] The forms were a mere subterfuge: The loan was not transferred, and the reasons provided were false. In fact, the loan officer would receive no compensation if they did not , and loan officers were specifically told that if they truthfully disclosed that the transfer was for "pricing" they would get paid nothing on a transaction. Moreover, the entire concept of a transfer of the loan was a subterfuge. In reality, the original loan officer continued to work on the loan, irrespective of the alleged transfer to an internal loan consultant. See Hearing Transcript at 1746-47; 1440:3-8 (Sarah Godinez testifying "I mean, nothing changed on the loan. We still worked with the same loan officer and the same loan officer assistants. It was a name. I – I really don't know if it was a real

Regulation Z required loan officers to submit a loan source code that inaccurately suggested the loan officer obtained the loan through loanDepot marketing events to justify a reduction in the compensation on loans where the pricing was more favorable to consumers. In these cases, loan officers were forced to lie and say that the borrower was obtained because of a company sponsored marketing event to justify the reduced commission. See Ex. 3, 1/12/21 email from Sean Johnson; Ex. 4, June 20, 2020, text message between Brian Covey and Sean Johnson. Again, this practice – referred to as "Region 9 Pricing" – was designed to maintain loanDepot profits at the expense of compliance with Regulation Z.

Bianchi was chiefly involved in designing, communicating, and implementing these policies. *See* 30 (b)(6) Brian Covey Dep. Tr. at 357-358 (indicating that "would be a John [Bianchi] question" regarding why loan officers were permitted to transfer loans to an ILC); *see also id*. at 383 (indicating Bianchi would have been involved in decision to credit loan officers for volume transferred to an ILC for internal perks but not full commission); *id*. at 190-192, 220-221, 245, 248. Moreover, Bianchi was directly involved in approving pricing exceptions where it was necessary to specify that one of the circumvention methods had been used. *See id.* at 213-215; 365; Ex. 5, November 19, 2020 text message between Covey and Johnson (instructing Johnson to add the "r9 code" before sending it to "john" for approval); Ex. 6, 11/12/21 pricing exception approval (Bianchi approving exception because "loan is in the ILC . . . need to match Broker."); Ex. 7, 10/13/21 pricing exception approval (showing Bianchi approving an exception that was an "ILC deal. Competing with BOA on rate."); Ex. 8 6/14/21 exception approval (Bianchi approving exception stating that it is an "ILC deal"). Bianchi's own emails reveal his critical personal involvement as he instructed loan officers to initiate ILC transfers before requesting pricing exceptions. *See* Ex. 9; 3/11/2020 email from John Bianchi.

Movement should be permitted to take Bianchi's deposition to establish the existence of these activities. loanDepot has accused Movement of all sorts of bad acts. Movement is entitled to a robust defense and discovery of any information relevant to that defense or calculated to lead to relevant information. If proven, these illegal practices provide a substantial basis to explain why loan officers sought to leave the company without any prompting from Movement. Thus, Bianchi's testimony is is relevant to damages, liability, and an unclean hands defense. Further, given Bianchi's personal and direct involvement in orchestrating these practices, including his specific instruction to "please transfer loans to the ILC before doing the PE request," his deposition is necessary.

**2.     Protective Order as to Depositions of Mike Brennan and Jason Stenger**[3]

---

person. I think it was – I think it was just – or at the time we all joked about the fact that it was an alias, you know, like calling somebody, you know, George Washington or Bill Clinton in the system." Tr. 1439: 13-21. She further testified, "We didn't have any interaction with this person and we didn't have any assistance from this person. If we had to change something in the loan, if the lock had to be updated, if somebody had to go talk to the borrower, it was always the original loan officers.").

[3] Movement has determined that it will make Ms. Dresnek available for deposition on a mutually agreeable date and thus will not seek a protective order with respect to her deposition.

Brennan and Stenger are Movement's President and Chief Operations Officer, respectively. Movement seeks protective orders relieving them of the obligation to testify under the Apex Doctrine. Their connection to this case is tenuous, at best.

First, loanDepot seeks Brennan's deposition because he had the initial phone call to recruit Mr. Sean Johnson ("Johnson") to loanDepot. According to Johnson, the only thing discussed was that Brennan would think about opportunities that might be available for him at Movement. Johnson confirmed nothing specific was ever discussed with Brennan as he merely introduced Johnson to Chris Shelton. Johnson Dep. Tr. at 74-75, 113-114. Yet after that initial conversation, Brennan had little involvement in Johnson's recruiting or on-boarding. Indeed, after that initial conversation—which Johnson explained was general and high level in nature— Brennan only met Johnson for dinner where others were present. There is no indication that Brennan had any substantive or significant involvement with Johnson's recruiting except at a high level involving generalized information.

Second, according to loanDepot, Stenger's entire relevance is that when Johnson visited Movement before joining, he had a brief, happenstance meeting with Stenger "for a minute . . . ." Johnson Dep. Tr. at 121. And according to Johnson, he did not discuss hiring or onboarding any other loanDepot employees with Stenger. Hearing Tr. at 1030-1031. Rather, he only discussed operations "generally" with Stenger. *Id*. at 1058-1059.

Under the Apex Doctrine, depositions of high-ranking corporate and governmental officers are only permitted upon a showing that those officers have particularly relevant information not equally available through less burdensome sources. *See In re Tylenol (Acetaminophen) Marketing, Sales Practices and Products Liability Litig.*, 2014 WL 3035791, at *2–3 (E.D. Pa. July 1, 2014). "Normally, courts will not allow an apex deposition if the high-ranking official does not have first-hand knowledge of relevant information, or if there are others equally well (or better) situated to provide such information." *Brit. Telecommunications PLC v. IAC/Interactivecorp,* 2020 WL 1043974, at *8 (D. Del. Mar. 4, 2020).[4]

Here, both Brennan and Stenger have little information relevant to this case. Both had general discussions with Mr. Johnson, and no communication relating to anything specific or pertinent to the recruiting of other loan officers or the alleged transfer of confidential information. loanDepot already knows this because they had the opportunity to question Johnson on multiple occasions and review all emails and texts pertaining to or referencing such communications. As such, a Protective Order should be issued precluding the depositions of Brennan and Stenger.

---

[4] loanDepot has advised Movement that it is in the process of producing additional documents that were the basis of Movement's intended motion to compel. Based on that representation, Movement does not intend at this time to move to compel these materials but reserves its right to bring the matter to the Court's attention depending on what loanDepot produces.

May 28, 2024
Page 5

        Respectfully submitted,

        */s/ Lauren P. DeLuca*

        Lauren P. DeLuca (#6024)

cc: All counsel of record (via ECF)