# EXHIBIT 10

Page 763

1                  JAMS ARBITRATION

2

3 - - - - - - - - - - - - - - - -:

4 LoanDepot.com, LLC,         :

5      Claimant,          : JAMS Reference No.

6   vs.                  : 5410000076

7 SEAN JOHNSON,            :

8      Respondent.      :

9 - - - - - - - - - - - - - - - -:

10

11

12

13                   HEARING

14                    DAY 3

15

16   The arbitration was held on Friday, February

17 23, 2024, commencing at 9:39 a.m., at the offices of

18 JAMS, 1155 F Street, NW, Room 6, Washington, DC

19 20005, before Carmen Smith, a notary public.

20

21           VERITEXT LEGAL SOLUTIONS

22              1-800-227-8440

```
                                                           Page 764
 1   APPEARANCES:

 2

 3   ARBITRATOR: LINDA R. SINGER, ESQ.

 4            lsinger@jamsadr.com

 5

 6      On behalf of the Claimant loanDepot:

 7      PAUL J. KENNEDY, CAMELLIA CAMPANELLI

 8            Littler Mendelson PC

 9            815 Connecticut Avenue, NW, Suite 400

10            Washington, DC 20006

11            202-842-3400

12            pkennedy@littler.com

13            ccampanelli@littler.com

14

15   On behalf of the Claimant loanDepot:

16       THOMAS W. CARROLL

17            Littler Mendelson PC

18            1900 Sixteenth Street, Suite 800

19            Denver, Colorado 80202

20            303-362-2838

21            tcarroll@littler.com

22                                          -- continued --
```

Page 765

1  APPEARANCES (Continued):
2
3  On behalf of the Claimant loanDepot:
4     LAUREN M. BRIDENBAUGH
5         Littler Mendelson PC
6         1800 Tysons Boulevard, Suite 500
7         Tysons, Virginia 22102
8         703-442-8425
9         lbridenbaugh@littler.com
10
11    On behalf of the Respondent Sean Johnson:
12    ARI KAREN, CORRINE BAHNER, BREE MURPHY
13        Mitchell Sandler LLC
14        1120 20th Street, NW, Suite 725
15        Washington, DC 20036
16        202-886-5260
17        akaren@mitchellsandler.com
18        cbahner@mitchellsandler.com
19        bmurphy@mitchellsandler.com
20
21
22

Page 1030

1  Network, at one time it brought over a whole group
2  of producers; right?
3      A    Yeah, it was a significant size.
4      Q    Significant size.  You brought in a number
5  of people; right?
6      A    Up and down the East Coast, right.
7      Q    Up and down the East Coast.
8           So someone like Jason Stenger has got to
9  be involved in that, because when you bring all
10 these people on, you want to be sure that they can
11 get the ground running and their loans will be
12 processed to closing without any hitches or delays;
13 right?
14     A    I don't know if Jason was involved in
15 that.
16     Q    I'm not asking you -- I'm asking you, you
17 know based on your experience, right, that
18 operations is important to the processing of loans;
19 right?
20     A    That's why I was meeting with them.
21     Q    Right.  And so when you bring in, let's
22 say, groups of people, you've got to ensure that the

Page 1031

1  business that they are able to handle can get
2  processed effectively; right?  Yes?
3       A    That was not part of the conversation.
4       Q    I'm not asking if that was part of the
5  conversation.  I'm asking you, based on what you
6  know about your employment with Movement and being
7  in the industry for how many years?
8       A    23.
9       Q    23.  So for being in the industry for 23
10 years, you know that when a group of people is
11 brought on, you've got to have the operational
12 support there to ensure that the volume that they
13 bring in can be handled; right?
14      A    When one person comes on, you've got to
15 make sure the operational support is there.
16      Q    When one person comes in.  And it's a lot
17 different when a group of people comes in; right?
18      A    There's different challenges.
19      Q    So when a group of people comes in, like
20 when mortgage network comes in, that's the type of
21 thing that Jason Stenger, the chief operations
22 officer, would be involved in; right?

Page 1058

1  selling loans; right?
2       A    Originating loans, yeah.
3       Q    Call it originating loans.  Some of them
4  were involved in processing loans; right?
5       A    No.
6       Q    Some of them were involved in operations?
7       A    I don't know that anybody was an
8  operational person.
9       Q    So these new people that came over, there
10 had to be some type of support to help them up and
11 run and do their job; right?
12      A    There's an existing staff, yeah.
13      Q    And you're saying that as far as you know
14 in Movement, there wasn't a lick of a change in the
15 operational staff in any way?
16      A    Off the top of my head, I don't believe
17 so.  We were assigned to Michelle Geurtsen's group
18 and --
19      Q    And you didn't talk, when you went down to
20 Charlotte, with Jason Stenger, now the chief
21 operating officer, about any operational changes?
22      A    I talked to him about operations in

Page 1059

1  general.
2      Q   Okay.  All right.  Well, here's -- here's
3  what -- here's what Mr. Shelton said about that.  He
4  says, and this is about that e-mail where he was
5  asking you volume.
6          Do you remember that where he was asking
7  about you and your team's volume?
8          MR. KAREN:  Objection.  We're going to now
9  read Mr. Shelton's examination and cross-examine him
10 with Mr. Shelton's testimony?
11         MR. KENNEDY:  I'm going to refresh his
12 recollection.
13         ARBITRATOR SINGER:  We all saw it.
14         MR. KAREN:  Okay.  All right.
15         BY MR. KENNEDY:
16     Q   Well, that's fine, let me ask it this way,
17 Mr. Johnson.
18         So do you remember you were asked some
19 questions about that text that you and Mr. Shelton
20 exchanged where he was asking you about volume and
21 you talked about 800 million, your team trending to
22 1.2 billion to 1.5 billion?  Do you remember --

Page 1385

```
                    JAMS ARBITRATION
--------------------------------:
loanDepot.com, LLC,             :
                                :
         Claimant,              :
                                :
     vs.                        : JAMES No.:
                                : 54100000 76
SEAN JOHNSON,                   :
                                :
         Respondent.            :(Pgs. 1385-1763)
--------------------------------:


                        HEARING
                         DAY 5

DATE:              February 27, 2024
TIME:              9:32 a.m.
LOCATION:          JAMS
                   1155 F Street, Northwest
                   Room 6
                   Washington, D.C. 20005

REPORTED BY:       Shari R. Broussard, RPR, CSR
                   Reporter, Notary



             Veritext Legal Solutions
          1250 Eye Street, NW, Suite 350
               Washington, D.C. 20005
```

```
 1              A P P E A R A N C E S
 2   ARBITRATOR:    LINDA R. SINGER, ESQUIRE
                    lsinger@jamsadr.com
 3
 4   On behalf of Claimant:
 5        PAUL J. KENNEDY, ESQUIRE
          CAMELLIA CAMPANELLI, ESQUIRE
 6        Littler Mendelson PC
          815 Connecticut Avenue, Northwest, Suite 400
 7        Washington, D.C. 20036
          (202) 842-3400
 8        pkennedy@littler.com
          ccampanelli@littler.com
 9
                    - and -
10
          THOMAS W. CARROLL, ESQUIRE
11        Littler Mendelson PC
          1900 Sixteenth Street, Suite 800
12        Denver, Colorado 80202
          (303) 362-2838
13        tcarroll@littler.com
14                  - and -
15        LAUREN M. BRIDENBAUGH, ESQUIRE
          Littler Mendelson PC
16        1800 Tysons Boulevard, Suite 500
          Tysons Corner, Virginia 22102
17        (703) 442-8425
          lbridenbaugh@littler.com
18
19
20
21
22
```

```
 1          A P P E A R A N C E S (Cont'd.)
 2   On behalf of Respondent:
 3        BREE MURPHY, ESQUIRE
          ARI KAREN, ESQUIRE
 4        CORRINE BAHNER, ESQUIRE
          Mitchell Sandler, LLC
 5        1120 20th Street, Northwest, Suite 725
          Washington, D.C. 20036
 6        bmurphy@mitchellsandler.com
          akaren@mitchellsandler.com
 7        cbahner@mitchellsandler.com
 8
 9   ALSO PRESENT:
10        Sean Johnson
          Meredith Grant, Esquire, loanDepot
11        Jace Stirling, loanDepot
12
13
14
15
16
17
18
19
20
21
22
```

1  C O N T E N T S
2  WITNESS:                                                PAGE
3  Lisa West
      Direct Examination                                   1389
4     Cross-Examination                                    1401
5  Sarah Godinez
      Direct Examination                                   1422
6     Cross-Examination                                    1455
7  Sumeeth Theruvath
      Direct Examination                                   1471
8     Cross-Examination                                    1511
      Redirect Examination                                 1558
9     Recross-Examination                                  1559
10 Justin Kozera
      Direct Examination                                   1561
11    Cross-Examination                                    1598
      Redirect Examination                                 1633
12    Recross-Examination                                  1636
      Re-Redirect Examination                              1637
13
   Lauren Rice
14    Direct Examination                                   1638
      Cross-Examination                                    1654
15    Redirect Examination                                 1679
      Recross-Examination                                  1681
16
   Sean Johnson
17    Direct Examination                                   1682
18
19
20
21
22

Page 1439

1  whatever the reasoning was that they had to move a
2  loan from the initial originating loan officer,
3  they would -- they would then put it in her
4  pipeline or reassign it to her to basically Etch A
5  Sketch the loan, start over, where they could
6  still move the loan forward as it was and close
7  it.
8       Q    And how would you learn that a loan had
9  been transferred to Ms. Mitchell?
10      A    The loan would show up in my pipeline
11 under her as the loan officer.
12      Q    Did this change impact you at all?
13      A    No.  I mean, nothing changed on the
14 loan.  We still worked with the same loan officer
15 and the same loan officer assistants.
16           It was a name.  I -- I really don't know
17 if it was a real person.  I think it was -- I
18 think it was just -- or at the time we all joked
19 about the fact that it was an alias, you know,
20 like calling somebody, you know, George Washington
21 or Bill Clinton in the system.  It was the same
22 thing.  Juanita was just a name that the loan went

Page 1440

1  to.  They could start the loan over and get it
2  closed.
3           We didn't have any interaction with this
4  person and we didn't have any assistance from this
5  person.  If we had to change something in the
6  loan, if the lock had to be updated, if somebody
7  had to go talk to the borrower, it was always the
8  original loan officers.
9       Q    So I take it you never met Ms. Mitchell?
10      A    No.  I never met anybody.
11      Q    Okay.  So you mentioned earlier that you
12 now work at Movement.
13           When did you start working there?
14      A    December 2021.  December 13th.
15      Q    And what led you to leave loanDepot and
16 join Movement in December of 2021?
17      A    I did not want to work there anymore.  I
18 had no reason to stay.  For -- do you want me to
19 expand on that because I had no reason to stay?
20      Q    Sure.
21      A    There were multiple reasons I had no
22 reason to stay.

Page 1746

1  Q   And when you're discussing ILCs and
2  Region 9 here, what are you explaining they're
3  being used for?
4  A   The way that an ILC was used was outside
5  the scope of any legitimate reasons for using an
6  employee with that title.
7  Q   ILC you mean?
8  A   ILC, yes.
9  Q   Okay.  Now, when a loan was transferred
10 in name to an ILC, was there an actual change in
11 who did the work?
12 A   No.
13 Q   And again I want to be very clear, we're
14 not talking about -- let's be clear so we don't
15 get confused.
16     When an ILC was changed because it was a
17 different state or a loan officer was taking
18 pregnancy leave, those are your legitimate
19 examples, right?
20 A   Correct.
21 Q   Okay.  And what is the scenario in which
22 there was not a legitimate transfer?

Page 1747

1     A    Pricing.
2     Q    Okay.  So what we're going to be talking
3  about now, just to make sure for everybody, we're
4  really just talking about ILC transfers for
5  pricing, right?
6     A    Yes.
7     Q    Okay.  So when there was a transfer for
8  pricing to an ILC, how did that change what the
9  initial loan officer did on the file?
10    A    It did not change.
11    Q    How did that change what the LO or
12 processor did on the file?
13    A    It didn't change.  It was the same --
14 same duties as they would do on a loan that was
15 still in the originator stage.
16    Q    Well, then how could you really call it
17 a transfer?
18    A    Because it reduced your compensation.
19    Q    Yeah, but, I mean, a transfer suggests
20 there was a change of responsibility, right?
21    A    It was three-card monte.  It was
22 literally just smoke in mirrors so that the

Page 1748

1   final -- because you're -- when comp payroll runs
2   everyone's comp, it goes by your employee I.D.
3   number.  Your employee I.D. number is attached to
4   your MLS number.  So once you moved it into
5   Juanita's name, it attached to that and that's how
6   the comp was paid out.
7        Q    But you're saying that they weren't from
8   a responsibility standpoint, actually transferring
9   at all?
10       A    Correct.
11       Q    So for your loans, the ones that you
12  transferred to an ILC, and we'll talk about those
13  a little later, are you saying that you continued
14  to work on those loans exactly the same as you did
15  with a loan that stayed in your name?
16       A    Yes.
17            MR. KENNEDY:  Objection.  Leading.
18            ARBITRATOR SINGER:  Sustained.
19  BY MR. KAREN:
20       Q    What difference, if any, existed between
21  the loans that remained in your name and loans
22  that were put in Juanita's Mitchell's name with

Page 1749

1  respect to the responsibility on those files?
2       A    There was no change.
3       Q    Did ILC transfers happen in the middle
4  of loans?
5       A    Middle, very, very end.  At any -- at
6  any point.
7       Q    Okay.  Let's look at Exhibit 3.07.  And
8  this is a text message between you and Mr. Covey.
9       A    Yes.
10      Q    Okay.  One thing I want to just reflect
11 here is that the time you see is UTC?
12      A    Yes.
13      Q    Do you see it says UCT?  And I'd like
14 just to take judicial recognition of the fact that
15 UTC is -- Eastern Standard Time is five hours
16 before UTC, if no one is going to object to that.
17           So, in other words, when we see here
18 that the first text is 13:41:39, if we did our
19 five-hour subtraction, that would be about
20 8:41 a.m.
21           Do you see that, Mr. Johnson?
22      A    Yes.