# EXHIBIT 11

Page 1

```
 1                    JAMS ARBITRATION
 2    LOANDEPOT.COM, LLC,                )
                                         )
 3                    Claimant,          )JAMS Reference
                                         )Number:  541000076
 4         v.                            )
                                         )
 5    SEAN JOHNSON,                      )Arbitrator:
                                         )Linda R. Singer
 6                    Respondent.        )
                                         )
 7    _____   )
 8
 9
10
11         Zoom Deposition of:
12
13         BRIAN COVEY
14
15         Taken on behalf of the Respondent
16
17         January 10, 2024
18
19    -------------------------------------------------------
20
21
22
23
24
25
```

```
                                                Page 2

 1    APPEARANCES:
 2     For the Claimant        PAUL KENNEDY, ESQ.
       via Zoom:               CAMELLIA CAMPANELLI, ESQ.
 3                             Littler Mendelson P.C.
                              815 Connecticut Avenue NW
 4                             Suite 400
                              Washington, DC 20006
 5                             (202) 842-3400
                              Pkennedy@littler.com
 6                             Cmokri@littler.com
 7                             LESLIE W. EHRET, ESQ.
                              BEN M. CASTORIANO, ESQ.
 8                             Frilot, LLC
                              1100 Poydras Street
 9                             Suite 3700
                              New Orleans, Louisiana 70163
10                             (504) 599-8203
                              Lehret@frilot.com
11                             Bcastoriano@frilot.com
12     For the Claimant        ARI KAREN, ESQ.
       via Zoom:               Mitchell Sandler, LLC
13                             1120 20th Street NW
                              Suite 725
14                             Washington DC 20036
                              (202) 886-5265
15                             Akaren@mitchellsandler.com
16
17
18     Also Present via        Meredith Grant, Esq.
       Zoom:                   Nick Helsabeck-Ochoa
19
20
21
22
23
24
25
```

Page 3

1                    I N D E X
2
                                                    Page
3
     Examination by Mr. Karen:                         7
4
     Examination by Mr. Kennedy:                     399
5
     Further Examination by Mr. Karen:              402
6
7                    E X H I B I T S
8                                                   Page
9    Exhibit No. 1   .............................    82
             Universal Residential Loan Application
10
     Exhibit No. 3   .............................    97
11           Role Specific Incentive Terms
             Producing Branch Manager
12
     Exhibit No. 4   .............................   256
13           loanDepot Permitted Loan Transfer
             Agreement
14
     Exhibit No. 7   .............................   313
15           E-mail Chain
16   Exhibit No. 8   .............................   307
             E-mail Chain
17
     Exhibit No. 9   .............................   310
18           E-mail Chain
19   Exhibit No. 10  .............................   312
             E-mail Chain
20
     Exhibit No. 11  .............................   332
21           E-mail Chain
22   Exhibit No. 13  .............................   326
             E-mail Chain
23
     Exhibit No. 16  .............................   298
24           Text Messages
25

Page 4

1    Exhibit No. 17  ...........................    300
           E-mail Chain
2
     Exhibit No. 18  ...........................    290
3          Text Messages
4    Exhibit No. 19  ...........................    293
           E-mail Chain
5
     Exhibit No. 21  ...........................     76
6          MBA Article
7    Exhibit No. 22  ...........................    338
           Expert Report of James M. Deitch, CMB
8
     Exhibit No. 23  ...........................    236
9          E-mail Chain
10   Exhibit No. 24  ...........................    265
           E-mail Chain
11
     Exhibit No. 25  ...........................    263
12         E-mail Chain
13   Exhibit No. 27  ...........................    373
           E-mail Chain
14
     Exhibit No. 28  ...........................    381
15         E-mail Chain
16   Exhibit No. 33  ...........................    224
           E-mail from Sean Johnson
17
     Exhibit No. 34  ...........................    197
18         Text Messages
19   Exhibit No. 35  ...........................    199
           Text Messages
20
     Exhibit No. 36  ...........................    203
21         Text Messages
22   Exhibit No. 38  ...........................    212
           Text Messages
23
     Exhibit No. 39  ...........................    207
24         Text Messages
25

Page 5

```
 1    Exhibit No. 40   ...........................   205
              Test Messages
 2
      Exhibit No. 41   ...........................   215
 3            Text Messages
 4    Exhibit No. 52   ...........................   368
              E-mail from Brian Covey
 5
      Exhibit No. 53   ...........................   372
 6            E-mail Chain
 7    Exhibit No. 54   ...........................   365
              Text Messages
 8
      Exhibit No. 55   ...........................   229
 9            HousingWire Article
10    Exhibit No. 56   ...........................   359
              Text Messages
11
      Exhibit No. 57   ...........................   365
12            Text Messages
13    Exhibit No. 59   ...........................    39
              Retail Master Incentive Plan
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1          The deposition of BRIAN COVEY was taken

2     by counsel for the Respondent via Zoom on

3     January 10, 2024 at 9:11 a.m. for all purposes

4     under the Rules of Civil Procedure.

5               It is agreed that Rhonda S. Nicholson,

6     being a licensed stenographic court reporter and

7     notary public for the State of Tennessee, may

8     swear the witness, and that the reading and

9     signing of the completed deposition by the witness

10    were not waived.

11

12

13                         *  *  *

14

15

16

17

18

19

20

21

22                    BRIAN COVEY

23    was called as a witness, and after having been

24    first duly sworn, testified as follows:

25

Page 7

1                    EXAMINATION

2      BY MR. KAREN:

3      Q.      Good morning, Mr. Covey.

4      A.      Good morning.

5      Q.      My name is Ari Karen.  Just refer to me as

6      Ari.  Have you ever been deposed before?

7      A.      I'm sorry.  Repeat that.

8      Q.      Have you ever been deposed before?

9      A.      I have once before.

10     Q.      Okay.  What did that involve?

11     A.      That was with Wells Fargo.

12     Q.      How many years ago, roughly?

13     A.      Over 10.

14     Q.      Okay.  Were you a party to that or just a

15     witness?

16     A.      Just a witness.

17     Q.      Okay.  And what did it just generally --

18     I don't need a long description.  What did it

19     generally involve?

20     A.      I was representing in the local office as

21     a manager against someone that had filed a claim.

22     So I just represented Wells Fargo, the local --

23     Q.      Okay.  Got it.  It was like a customer or

24     something like that?

25     A.      Correct.

Page 190

1    gets transferred to an ILC that is a not permitted
2    transfer, the ILC gets paid the same amount they
3    get paid on any other loan, for example, that they
4    would have done themselves?
5    A.      The ones in Region 9 were set up as a flat
6    basis point on anything that funded in their name.
7    Q.      Okay.  So if I was getting 20 basis --
8    let's say my name is Juanita and I'm getting 20
9    basis points, right?  I get that 20 basis points
10   whether it's my next-door neighbor, who I referred
11   him myself, or whether it's a loan transfer from
12   Sean Johnson?
13   A.      Correct.
14   Q.      Okay.  Now I think we understand.  Got it.
15   All right.  Thank you for going through that with
16   me.  I'm sorry.  That was a little confusing.
17           All right.  So now that we talked about
18   that for a while -- I want to bring your attention
19   to the Region 9 pricing, the corporate-sourced
20   Region 9 pricing we talked about earlier.
21   A.      The code or the pricing?
22   Q.      The code.
23   A.      Okay.
24   Q.      And I want to make sure -- just restoring
25   conversation on the same field, right?  Region 9

1    pricing referred to -- was essentially a form, as

2    we discussed before, of corporate sourced --

3    corporate-sourced pricing, right?

4    A.        Correct.

5    Q.        Okay.  So when did Region 9 pricing get

6    started?  When did that field come into existence?

7    A.        I believe -- I don't know the exact month,

8    but somewhere in 2020, early 2020.

9    Q.        And was that your idea or was that --

10   well, whose idea was it?

11   A.        It had been in existence prior to

12   Region 9.  Some regions had a similar code, I

13   believe, but around that time is when it started.

14   It wasn't a new idea.

15   Q.        Okay.  But how did it start?  Did it start

16   with you or did somebody above you tell you, Hey,

17   we're going to have this Region 9 code?

18   A.        The people involved in -- in some of those

19   or anything like that would have been John Bianchi

20   or Brigitte Ataya, legal, HR, to add something

21   like that.

22   Q.        Well, how did it get -- okay.  So it was

23   not something that was your impetus?  You didn't

24   say, Hey, let's do this and call it Region 9

25   pricing?  Someone somewhere told you, We can do

Page 192

1    Region 9 pricing, right?

2    A.      For those -- yes.  To track them and to

3    make sure we were keeping up with those.  Yes.

4    Q.      Okay.  So who was it that advised you of

5    the ability to do Region 9 pricing?

6    A.      It would have been one of those -- I don't

7    remember if it was -- was John's team with

8    Brigitte, legal or HR.  I don't -- I don't

9    remember who was the one that said, Okay, you can

10   do that now, as -- there were a few regions

11   that -- that we launched that.

12   Q.      Okay.  But would it have been Paul Ramos

13   or would it have been above Paul?

14   A.      For Region 9, it would have probably been

15   above Paul.  That's why I said -- John Bianchi

16   probably would have had to have been involved to

17   bless it and approve it.

18   Q.      And what -- and what I'm saying, you know,

19   not only who would have been involved to approve

20   it.  But who -- how was it communicated to you?

21   Was it in a memo?  Was it a phone call?  How were

22   you -- how were you communicated about the ability

23   to do Region 9 pricing?

24   A.      There were e-mails, as the code -- like a

25   builder code would have to be created.

1      A.      That's -- I do not remember.

2      Q.      But that seems like a pretty specific word

3      for two different individuals to use, doesn't it?

4                     MR. KENNEDY:  Objection.

5      Speculation.  Foundation.

6                     THE WITNESS:  I do not remember it

7      being a drop-down.

8      BY MR. KAREN:

9      Q.      Okay.  Is it possible that it was?

10                    MR. KENNEDY:  Objection.

11     Speculation.  Foundation.

12                    THE WITNESS:  It could be, but I

13     just -- I do not remember it being one.

14     BY MR. KAREN:

15     Q.      Okay.  So this also says "organic."  Did

16     you ask in this text chain, as far as we could

17     see, what organic means?

18     A.      No.

19     Q.      Okay.  But this text bullet says, "This

20     loan has an existing pricing exception of .9."  Do

21     you see that?

22     A.      I see on the mello app that -- yes.

23     Q.      Yes.  The mello app.  Right.  And what

24     is -- what question did you ask upon seeing this?

25     A.      "We doing Region 9?"

1    Q.     You didn't ask where did it come from?

2    You just said -- you just saw that there was a

3    price exception and you asked, Are we doing Region

4    9?  Did I read that correctly?

5    A.     And to add -- and to add some context, the

6    expectation at the local market was -- that's the

7    ones that they would have scrubbed and they would

8    have known and been able to assist in that.

9                 MR. KAREN:  Let's go back to Exhibit

10   35.

11   BY MR. KAREN:

12   Q.     You say, "Add R9 code and will send up."

13   Do you see where you say that?

14   A.     I do.

15   Q.     What does "will send up" -- who -- what do

16   you mean by -- what did you mean by "will send

17   up"?

18   A.     This appears to have a price exception

19   that would go beyond my approval level with the

20   higher price exception, and so it would require to

21   go up -- potentially Paul Ramos or John Bianchi.

22   Q.     Okay.  And you specifically said before

23   you send it up, that you want them to add the R9

24   code?

25   A.     As the notes indicate below, "Competing.

Page 215

1    Can do R9 if needed.  Competing with Quicken."  So
2    when a manager suggests that and that's what they
3    believe is an option --
4    Q.      Okay.  Here's my question.
5    A.      -- I'm supporting their recommendation.
6    Q.      Okay.  Here's my question:  You wanted the
7    people above you, either Ramos or Bianchi, to know
8    what was an R9 in connection with approving the
9    pricing exception, didn't you?
10   A.      If they recommended this as they did
11   below, which would have been Sean's comments, yes,
12   it would -- it would notate that it was Region 9
13   if they added the code.
14   Q.      My point is, you wanted them to add that
15   before it went to Bianchi or Ramos, didn't you?
16   A.      Yes.
17           MR. KAREN:  Let's go to Exhibit 34.
18   I'm sorry.  Hold on.  Exhibit 41.  I apologize.
19           (Document marked Exhibit No. 41.)
20           MR. KENNEDY:  By the way, are you
21   introducing all these exhibits?  Will they be
22   attached to the transcript?
23           MR. KAREN:  They will be.  Yes.
24           MR. KENNEDY:  All right.
25           MR. KAREN:  Rhonda, you have them,

Page 220

```
 1      Q.      And who were these people on this text
 2      chain?  I know their names.  But what positions
 3      were they?
 4      A.      Branch managers or area managers --
 5      Q.      Got it.  So under --
 6      A.      -- in Region 9.
 7      Q.      -- you, right?
 8      A.      In Region 9.
 9      Q.      Under you?  Okay.  They all reported to
10      you?
11      A.      Correct.
12      Q.      Okay.  So you were telling the region it
13      was going away?
14      A.      Correct.
15      Q.      Okay.  And this would have been Ramos
16      telling you this, I presume?
17      A.      I do not recall how that -- it could have
18      been on a call with John that we -- we said it was
19      a divisional call or with Paul.  I do not remember
20      who was on the call for this specific call.
21      Q.      Okay.  So sometimes John joined these
22      calls?
23      A.      Correct.  Sometimes we did these together.
24      Sometimes John joined.  Sometimes not.
25      Q.      Okay.  So you don't know -- remember who
```

1    was specifically telling you during this that

2    Region 9 was going away?

3    A.      I do not.

4    Q.      Okay.  But it's likely that it would have

5    been either John or Paul; is that right?

6    A.      John or Paul, yes, would have been on

7    there.

8    Q.      Okay.

9    A.      I'll say that.

10   Q.      And it says it came up again.  Had it come

11   up previously?  I mean, I assume so if it says,

12   "Came up again."

13   A.      I don't remember when it came up again,

14   but I do remember around this time that some

15   questions had come up about using the source code,

16   and we had questions around that.  And so I'm

17   guessing it came up again January 14th.  So I got

18   to the team probably when I got new information.

19   Q.      Okay.  And there had been questions.  What

20   kind of questions?

21   A.      I do not know back then of what those

22   might have been.

23   Q.      Well, would it have been compliance

24   related, legally related?  Like is it something we

25   could do legally?

1    A.        -- with a text.

2    Q.        Right.  And I guess, though, let me break

3    this in two pieces.  What would have been

4    discussed -- would you -- strike that.

5              Would you have explained in your e-mails

6    to Region 9 why Region 9 was going away or what

7    some of the concerns were?

8    A.        I would expect that to be more of the

9    conversation.  There would have been an e-mail of

10   us getting rid of it.  But typically, things like

11   that, if there's context to it, I'm a phone call

12   kind of person and -- and talk through it.

13   Q.        And then there's the other side of the

14   discussion, which would have been Paul Ramos and

15   John Bianchi to you?

16   A.        Correct.

17   Q.        And would that have only -- would there

18   have been e-mails pertaining to that or would that

19   have only been the division call, if you recall?

20   A.        I do remember something from Brigitte, who

21   is on John's team directly, that works with

22   Bianchi, that -- Brigitte sending out the reminder

23   and something around those going away.  Make sure

24   that we pull the pipeline and -- and all the

25   things, but that would have been from Brigitte,

Page 248

1    I don't remember anything from a corporate

2    standpoint.  No.

3    Q.    Okay.  And I think we -- I don't know if I

4    asked you exactly this question.  I -- I do recall

5    you telling me that you would have -- it would

6    have been communicated to you either by Ramos or

7    Bianchi.  My question is slightly different, which

8    was:  Do you know who would have developed the

9    concept of Region 9 before you were informed of

10   it?

11   A.    I do not know.  I do know there was some

12   regions prior to ours that had similar codes set

13   up.  I don't know what they were used for,

14   tracking the builder, tracking market.  I don't

15   know that.  But I do remember -- ours was not the

16   first one set up.  But outside of that and which

17   regions or dates, I don't know.

18   Q.    Do you know if the other similar source

19   codes that other regions set up similar to Region

20   9 also went away at the same time the Region 9

21   source code went away?

22   A.    I believe they did.  That was the e-mails

23   referred to from Brigitte, is all the source codes

24   that were potentially a region set up if they had

25   one.  Again, I don't know if all the regions, some

Page 357

1      reflecting the policy -- the practices, policies
2      and rules pertaining to permitted loan transfers?
3                    MR. KENNEDY:  Objection.
4      Speculation.
5                    THE WITNESS:  Yes.  And then
6      typically if there were any changes or anything
7      we'd need to go over, we would also do a call.
8      BY MR. KAREN:
9      Q.      And who would lead that call?
10     A.      They would typically start with John
11     Bianchi when he was the national.  And that would
12     disseminate through the divisionals, Paul Ramos
13     and my group and then myself.  Typically, HR would
14     be on those if it was compensation related.
15                   And that would roll out for any
16     questions -- to go through the plan prior to those
17     being sent to everyone and making their elections,
18     whether it be SEC or basis points, commission cap.
19     They would go through all of that so that when
20     their retail incentive plan was sent, they could
21     sign it.
22     Q.      When you said "HR," would that be Michelle
23     Alexander typically?
24     A.      For our group.  Yes.
25     Q.      Okay.  Now, why was -- why did loanDepot

Page 358

1       allow loan transfers that were not compensable to
2       be made at all?  Do you understand my question?
3       A.      I do not.  Can you rephrase it or --
4       Q.      If you don't, I could rephrase it.  Sure.
5       Okay.  Let me break this down.  We've got
6       permitted loan transfers, right, and then you have
7       loans that are transferred that are not permitted
8       loan transfers, correct?
9       A.      Correct.
10      Q.      Why not just disallow the transfers that
11      aren't permissible?  Do you follow what I'm
12      saying?  Rather than just not pay them, why not
13      disallow them all together?
14      A.      I don't know the answer to that.  That
15      would have been a John question or legal or HR and
16      guidance they may have received.
17      Q.      Okay.  And I don't want you to speculate.
18      If you don't know, then you don't know.  But if
19      you --
20      A.      I don't know.
21      Q.      Do you have any reason to know?
22      A.      I do not.  I wouldn't -- I would not know
23      as a VP.
24      Q.      Okay.  Well, I'm asking, though, also in
25      the capacity of 30(b)(6) because I think these

Page 365

1      BY MR. KAREN:
2      Q.      But -- okay.  Well, that's fine.
3                   MR. KAREN:  Let's go to Exhibit 57.
4              (Document marked Exhibit No. 57.)
5      BY MR. KAREN:
6      Q.      This is another loan between -- that
7      you're discussing.  And you say to Mr. Johnson,
8      "Need to have an ILC name before I can verify and
9      send on.  Thanks."  Do you se that?
10     A.      I do.
11     Q.      And when you're saying "send on," you're
12     talking about sending on to Mr. Ramos and/or
13     Mr. Bianchi for approval, right?
14     A.      Correct.
15     Q.      Okay.  So it's important for them to see
16     that it had been put in an ILC name before you
17     sent it on, right?
18     A.      Correct.
19     Q.      Because that would tell them that the
20     hundred basis points you otherwise were paying the
21     loan officer isn't in there anymore, right?
22     A.      Correct.
23                  MR. KAREN:  Let's go to Exhibit 54.
24             (Document marked Exhibit No. 54.)
25     BY MR. KAREN:

1    A.      Yeah.  From reading this and what I

2    remember is Paul Perscell in marketing -- there

3    were certain loans.  So, for example, that were

4    sent to an ILC for pricing reasons here, those

5    were not included in their volume and unit count

6    for what we submitted to Scotsman's Guide, which,

7    as you know, is a third party.

8    Q.      Why not?

9    A.      I don't know.  That wasn't my decision.

10   That would have been above my pay grade.

11   Q.      Do you know who would have made that

12   decision?

13   A.      I mean, it appears Paul Perscell, most

14   likely, in marketing.  And probably worked with

15   John Bianchi, I would expect.

16   Q.      Okay.  But then -- but it would -- again,

17   but it would qualify for Chairman Elite?

18   A.      That's my recollection.

19   Q.      So my question is -- okay.  So my question

20   is, though, then why would -- what would the

21   internal marketing -- "I am working on internal

22   marketing," what does that mean?

23   A.      Sean had hit a milestone, I believe, that

24   year of a hundred million.  And without these, it

25   showed 97.5.  And so I was going to work with our

Page 405

```
 1        STATE OF TENNESSEE        )
                                    )  SS
 2        COUNTY OF DAVIDSON        )

 3               I, Rhonda S. Nicholson, a Licensed

 4        Stenographic Court Reporter and Notary Public

 5        within and for the State at Large, do hereby

 6        certify that the foregoing was taken at the place

 7        set forth in the caption thereof; that the

 8        proceedings were stenographically reported by me

 9        in shorthand; and that the foregoing pages

10        constitute a true and correct transcription of

11        said proceedings to the best of my ability.

12               I further certify that I am neither a

13        relative nor employee nor attorney nor counsel of

14        any of the parties to this action, and that I am

15        neither a relative nor employee of such attorney

16        or counsel, and that I am not financially

17        interested in the outcome of this action.

18               WITNESS MY SIGNATURE this 19th day of

19        January, 2024.

20        Rhonda Nicholson

21
          Rhonda S. Nicholson, RPR, LCR #160

22        LCR Expires:  06/30/2024
          Georgia CSR 5619-8878-0687-3600

23        Notary Public at Large,
          State of Tennessee

24        My Commission Expires:

25        03/02/2026
```