

Andrew L. Cole
Member
Admitted in DE, FL, MD and VA

Reply to Delaware Office
Writer's Direct Line: 302.651.2011
Writer's Direct Fax: 302-652-3117
Writer's E-Mail: acole@coleschotz.com

500 Delaware Avenue, Suite 200
Wilmington, DE 19801
302-652-3131   302-652-3117  fax
—
New Jersey
—
New York
—
Maryland
—
Texas
—
Florida

June 4, 2024

**Via CM/ECF Filing**

Honorable Christopher J. Burke
U.S. District Court for the District of Delaware
844 N. King Street
Unit 28, Room 2325
Wilmington, DE  19801

      Re:    loanDepot.com, LLC v. Movement Mortgage, LLC
               C.A. No. 23-cv-00681-MN

Dear Judge Burke:

      In accordance with the Court's May 21, 2024 Oral Order (ECF No. 67), Plaintiff loanDepot.com, LLC ("loanDepot") submits this letter outlining the issues with respect to the first three bullet points in the May 14, 2024 letter.[1]

**A.**    **John Bianchi Deposition Motions**

      Movement seeks to depose loanDepot EVP, National Production Manager, John Bianchi. Movement argues that droves of loanDepot employees departed its employ (mostly to sign on with Movement) because they were dissatisfied with events and business practices occurring at loanDepot. ECF No. 70, 1. Movement postulates that loanDepot "force[d] employees to falsify documents to create a cover to conceal these practices from federal regulators." *See id.* 1-3. Movement claims it must depose Mr. Bianchi "because according to the evidence, he was a chief architect of and/or implemented these practices." *Id.* 1. Movement's request for Mr. Bianchi's deposition, however, runs squarely into the apex doctrine.

      Under the apex doctrine, courts allow the depositions of high-ranking corporate officers "only upon a showing that those officers have particularly relevant information to offer that is not equally available from other, less burdensome sources." *British Telecoms. PLC v. IAC/Interactivecorp*, Civil Action No. 18-366-WCB, 2020 U.S. Dist. LEXIS 37271, at *24-25 (D. Del. Mar. 4, 2020) (collecting cases). "Normally, courts will not allow an apex deposition if the

---

[1] Defendant Movement Mortgage, LLC's ("Movement") May 28 letter to the Court no longer seeks a protective order for Alison Dresnek or to compel a document production and, therefore, loanDepot does not address those points herein.

high-ranking official does not have first-hand knowledge of relevant information, or if there are others equally well (or better) situated to provide such information." 2020 U.S. Dist. LEXIS 37271, at *25 (citations omitted). These two factors – "the knowledge requirement" and "the no-less-intrusive-means requirement" – are the primary guideposts for the apex doctrine. *In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig.*, 2014 U.S. Dist. LEXIS 89981, at * 8 (E.D. Pa. July 1, 2014) (citation omitted).

Mr. Bianchi's status as EVP, National Production Manager triggers the apex doctrine. Mr. Bianchi reports to Jeff Walsh, President, LDI Mortgage, and partners with executive leaders and teams across loanDepot to develop products, services and strategies to fuel growth. loanDepot's team of Divisional Executive Managers reports to Mr. Bianchi, giving him oversight responsibility for more than 1,000 employees and 15,000 customers. Thus, Mr. Bianchi is a high-ranking corporate executive. *See* 7 Moore's Federal Practice – Civil § 30.03 (2024) (Apex doctrine applies where a party seeks to depose a "high-ranking corporate officer"). Once it is established that Mr. Bianchi's status triggers application of the apex doctrine, the burden shifts to Movement to establish the knowledge and no-less-intrusive-means elements. *Id*. Movement can clear neither hurdle.

As to knowledge, Movement's apparent intent in deposing Mr. Bianchi is to show that loanDepot was a bad place to work because it engaged in illegal pay practices (which loanDepot denies), and that is one reason employees left for Movement. But that misses the point. The issue here is why *these employees* (47 of them) left. Not only does opening the door with Mr. Bianchi to probing discovery about these alleged practices invite wasteful mini-trials about loanDepot's business, but even if it yielded evidence of wrongdoing, Movement says nothing about how that tends to show even one of the 47 left because of that wrongdoing. At bottom, he does not have specific or unique knowledge that others do not.[2] *See* **Ex. 1** (John Bianchi Declaration). As such, Movement cannot satisfy the first step of the analysis.

The best that Movement can muster is that former loanDepot executive Brian Covey testified in a related arbitration involving former loanDepot (and current Movement) employee Sean Johnson that Mr. Bianchi was identified as having "relevant information of these practices …." ECF No. 70, 1. Yet Mr. Covey's arbitration testimony went to a counterclaim by Mr. Johnson for unpaid commissions, where loanDepot's alleged payment practices were in issue for purposes of establishing how much Mr. Johnson claims he was owed.

Here, however, Movement has only an unclean hands affirmative defense that says loanDepot's unlawful pay practices were one reason (among several) why employees left for Movement. The Covey testimony to which Movement points highlights its misdirection. Movement claims Mr. Covey testified that Mr. Bianchi would have to answer a question "regarding why loan officers were permitted to transfer loans to an ILC." *Id*. 3. Mr. Bianchi's

---

[2] Other individuals from loanDepot including, but not limited to, its SVP Production (Tom Fiddler), who reports to Mr. Bianchi, can offer testimony about internal loan consultants, loan transfers and use of source codes (without conceding the relevance of those topics).

Honorable Christopher J. Burke
June 4, 2024
Page 3

conceivable answer to that question in a deposition places Movement in no better position to argue that loanDepot's pay practices were unlawful much less a causative factor.[3]

Even further to the apex analysis, Mr. Covey identified at least three other avenues aside from Mr. Bianchi that may answer this single question, none of which Movement has pursued. ECF No. 71-10, 358:14-16 (emphasis added) ("That would have been a John question **or legal or HR and guidance they may have received**."). Movement has not shown, as it must, that this information is not available from other, less burdensome sources.

**B.     Mike Brennan and Jason Stenger Deposition Motions**

Stated colloquially, Movement plays copycat with the apex doctrine. Unlike Mr. Bianchi, Mike Brennan and Jason Stenger do have direct personal knowledge of the claims/facts at issue. In this case, Movement targeted loanDepot employees, inducing them to breach their obligations. This activity was taken at the highest levels of Movement, not by rogue, low-level employees.

Evidence of Mr. Brennan's direct and significant involvement is already plentiful.[4] Mr. Shelton (who reported to Mr. Brennan) testified at Mr. Johnson's arbitration that Mr. Brennan was initially "in the lead" to recruit Mr. Johnson, and he also told Mr. Shelton that Movement would have to make some "internal changes" to accommodate Mr. Johnson. Hearing Tr., **Exh. 2**, 73:21-74:22, 56:22-57:1. After not being in touch for years, Mr. Brennan texted Mr. Johnson "out of the blue" on October 5, 2021, leading to conversations that resulted in the departure of Mr. Johnson's team of 26 loanDepot employees. *Id.* 332:21-334:15.[5] Mr. Brennan also was involved in the decision to bring Mr. Johnson over in a non-producing capacity and leadership role. *Id*. 91:12-16, 1027:9-18.  Mr. Shelton testified that by the time Mr. Brennan connected him with Mr. Johnson, the lift-out was a "done deal". *Id*. 115:1-19. Mr. Brennan was "driving it from the get [go]." *Id*. 83:11-19. Mr. Brennan, who had just become President, was "really excited" about bringing on Mr. Johnson and his team to grow the company. *Id*. 104:3-105:3. Mr. Brennan communicated with Mr. Shelton and Ms. Drensek regarding offers to other loan officers that worked under Mr. Johnson at loanDepot. **Exh. 3**. No one else can testify about how the Johnson raid was planned, initiated, and packaged for Mr. Shelton to execute.

As for Mr. Stenger, Movement again misrepresents his involvement. Movement claims Mr. Stenger's "entire relevance" is that "he had a brief, happenstance meeting" with Mr. Johnson.

---

[3] Movement similarly mischaracterizes Mr. Covey's testimony as to Mr. Bianchi's involvement in approving pricing exceptions for borrowers. *See* ECF No. 70, 3. It apparently wants high-level testimony from Mr. Bianchi about the policies and practices underlying price exceptions. But whether Mr. Bianchi set policy for pricing exceptions does not bear on any reason for the 47 employees' departures.

[4] Notably, Mr. Brennan was mentioned 68 times in the hearing transcript from Mr. Johnson's arbitration. Hearing Tr. (Index), 67.

[5] Mr. Johnson could not recall if he called Mr. Brennan or Mr. Brennan called him. *Id*. 333:2-5. Thus, Mr. Brennan's testimony may explain the genesis of the initial call, a potentially important fact.



Honorable Christopher J. Burke
June 4, 2024
Page 4

ECF No. 71, 4. However, given Mr. Stenger's position as Chief Operations Officer, loanDepot submits that he was involved in the "internal changes" that Mr. Brennan mandated.[6] Mr. Stenger "was responsible for ensuring that loans within Movement can be processed on the operations side efficiently and effectively." Hearing Tr. 1029:2-10. With a group of new employees joining Movement, Mr. Stenger "would make sure he had the right staff deployed." *Id*. 1031:19-1032:2. He would provide any incoming loan officers the necessary operational support to sell and close loans. *Id*. 1023:3-7. Mr. Stenger necessarily would have relevant information about operational accommodations to facilitate the influx of loanDepot employees and business to Movement. Given the high levels within Movement at which these machinations occurred, none of this is information to which a lower-level employee can testify.

Accordingly, loanDepot requests that the Court enter the Proposed Order attached as **Ex. 4**.

Respectfully,

Andrew L. Cole (No. 5712)

Enclosures
cc:     All Counsel of Record (w/encl. – Via CM/ECF Filing)

---

[6] Mr. Stenger was mentioned 11 times in the Johnson arbitration testimony. Hearing Tr. (Index), 467.