1  LOANDEPOT.COM, LLC          *

2       Claimant,             *

3  v.                         *   JAMS No.:

4  SEAN JOHNSON              *   541000076

5       Respondent           *

6  *****************************************************

7

8

9              TRANSCRIPT OF PROCEEDINGS

10

11      HEARING DATE:  February 21, 2024, 9:00 a.m.

12      BEFORE:  Linda Singer, Arbitrator

13

14

15

16

17

18

19

20

21

22

1              A P P E A R A N C E S

2

3   ON BEHALF OF LOANDEPOT:

4         PAUL J. KENNEDY, ESQUIRE

5         LAUREN M. BRIDENBAUGH, ESQUIRE

6         Littler Mendelson, P.C.

7         815 Connecticut Avenue, NW, Suite 400

8         Washington, D.C. 20006

9

10        THOMAS W. CARROLL, ESQUIRE

11        Littler Mendelson, P.C.

12        1900 Sixteenth Street, Suite 800

13        Denver, Colorado 80202

14

15  ON BEHALF OF SEAN JOHNSON:

16       BREE MURPHY, ESQUIRE

17       ARI KAREN, ESQUIRE

18        Mitchell Sandler, PLLC

19        1120 20th Street, NW, Suite 725

20        Washington, D.C. 20036

21        bmurphy@mitchellsandler.com

22  (Appearances continued on next page.)

1            A P P E A R A N C E S Continued

2

3         MEREDITH GRANT

4         LoanDepot

5         6561 Irvine Center Drive

6         Irvine, California 92618

7

8         JACE STIRLING

9         LoanDepot

10         888 Bestgate Road

11         Suite 420

12         Annapolis, Maryland 21401

13

14

15     ALSO PRESENT:

16         Sean Johnson

17         Corinne Bahner

18

19

20

21

22

1    Q.   Direct report or was there anybody in between

2   you?

3    A.   Direct report.

4    Q.   Okay.  Did you remain his boss or supervisor

5   for the entire time until you left Movement in 2023?

6    A.   Correct.

7    Q.   Mr. Shelton, let me return back to some

8   questions more about you and your time at Movement.  In

9   particular, I'd like to focus in on your time as

10  divisional leader, which is, I understand it, you took

11  maybe sometime in 2020 or 2021; is that right?

12   A.   Correct.

13   Q.   Okay.  And you held that position until you

14  left in June of '23?

15   A.   Yes.

16   Q.   Okay.  As always is possible I might ask a bad

17  question or it won't be clear, but I'll tell you now, my

18  questions in this section are really geared toward your

19  time as divisional leader, to go back to that regional

20  director, area director time.  All right?

21   A.   Okay.

22   Q.   As divisional leader, who did you report to?

1     A.    Mike Brennan.

2     Q.    The president of Movement Mortgage, right?

3     A.    Correct.

4     Q.    And was he your boss throughout the time that

5  you were divisional leader?

6     A.    Yes.

7     Q.    Okay.  As divisional leader, did you have

8  people directly reporting to you?

9     A.    Yes.

10     Q.    At the moment, I won't make you name them all,

11  but at least generally speaking, who was it that

12  reported to you?  What sort of positions were those

13  people in?

14     A.    So I had, let's see, I had five regional

15  directors that reported to me; a marketing support

16  staff; and my assistant.  Actually, I had some other

17  direct reports that I had.  Our building manager and I

18  had some folks off and on report to me that were in the

19  coaching department.  But consistently, it was more

20  regional directors.

21     Q.    Okay.

22     A.    That was kind of who I was responsible for.

1      A.    Correct.

2      Q.    And from there, was it a coordinated effort

3   between you and Mr. Johnson about the other employees?

4      A.    Yes.

5      Q.    I'd like to start with Mr. Johnson, and then

6   we'll come back to the others.  Okay.

7      A.    Okay.

8      Q.    And I can't promise they're not going to bleed

9   together a little bit.

10     A.    Okay.

11     Q.    So generally speaking, Mr. Shelton, what was

12  your involvement in recruiting Sean Johnson?

13     A.    Well, it wasn't a ton because he obviously

14  knew the company well, and, you know, I don't -- I don't

15  think things were going great for him at LoanDepot.

16  Whatever that was, I don't know.  But so my involvement

17  was we got on the phone and he came to Charlotte and we

18  had dinner and we talked through some different team

19  members on his team and we hired Sean and some of those

20  team members.

21     Q.    Is it safe to say that on the Movement side of

22  things you were in the lead on bringing over Sean?  '

1    A.   I would say initially it was Mike Brennan, the

2  president, but yes, he -- he kind of passed it over to

3  me to take charge.

4    Q.   So how did you first become involved?

5    A.   I was -- I was saying I was at our corporate

6  office.  I only live a few hours from there.  So I was

7  there quite a bit and, you know, Mike said, hey, Sean

8  Johnson is interested in coming back to Movement.  You

9  need to get on the phone and talk to him.  So I got on

10  the phone and talked to him.  We scheduled a dinner for,

11  I want to say, later that week.  It was pretty quickly.

12  I don't know the dates.  I don't remember the dates.

13  And then he -- he came up to dinner and that was kind of

14  -- that was it.

15    Q.   Okay.  What else do you remember about that

16  initial conversation with Mike Brennan?  What else did

17  he tell you or instruct you?

18    A.   He said we're going to have to make some

19  internal changes because, you know, currently some of

20  the states that Sean is going to cover are already being

21  covered by somebody else.  And so, you know, we're going

22  to have to have some tough conversations with my peer,

1          A.   Yes.  He works for Alison, and he probably

2     kind of helped us with all of the offer letters,

3     employment agreements, stuff like that.

4          Q.   So same like it was as Alison?

5          A.   Correct.

6          Q.   I see.  And then was your assistant, Linda

7     Plymale, playing her typical role as your assistant?

8          A.   Yes.  So she -- she was helping me keep every

9     -- keep all of it organized and help, you know, onboard

10    a lot of the team.

11         Q.   Is there anybody else that we haven't talked

12    about just now that on the Movement side that was

13    involved in recruiting and hiring Sean Johnson and his

14    team from LoanDepot in 2021?

15         A.   I think we've covered everybody.

16         A.   Okay.  So is it safe to say you're the one

17    sort of driving it day in and day out?

18         A.   Yes.  I mean, I -- I think Mike was driving it

19    from the get, you know, but then I executed on it.

20         Q.   Thank you for clarifying. Did Mr. Brennan

21    continue to play a role after he tapped you to execute?

22         A.   He was at the dinner with Sean Johnson when he

1    in loan volume.

2         Q.   When you say $1.2 billion in loan volume, is

3    this across his entire team?

4         A.   Correct.

5         Q.   And these are the 25 or so loan officers that

6    came with him and then continued to work with him at

7    Movement?

8         A.   Correct.

9         Q.   All right.  What did you know about Sean

10   Johnson's interest in Movement before you actually spoke

11   to him yourself?

12        A.   I just knew that he wanted to come back, and

13   he wanted to be in a leadership position.

14        Q.   And are those both things you learned from

15   Mike Brennan?

16        A.   Yes.

17        Q.   Okay.  At the time, did you have an

18   understanding of why Mr. Johnson wanted to come back to

19   the Movement?

20        A.   Yes.

21        Q.   And what was that?

22        A.   LoanDepot was having, I guess, some internal

1      Q.   Mr. Johnson's?

2      A.   Correct.

3      Q.   Okay.  And so when you're saying "the team is

4   on track," is that the same team of 20 or 25 loan

5   officers we've been talking about already?

6      A.   Let me read this here.  Yes.

7      Q.   All right.  Where did you get these numbers?

8      A.   Probably a combination of Mike Brennan and

9   Sean Johnson.

10     Q.   All right.  Which portions came from Mr.

11  Brennan and which portions came from Mr. Johnson?

12     A.   I think both.  You know, I think Mike probably

13  told me, hey, well, you -- I could look up -- I could

14  look up everyone on this team's volume in MMI.  But I'm

15  sure Mike said, hey, the team did, you know, the zone

16  tried to do 1 1/2 billion in volume, and Sean's going to

17  do 140 million.  And then I'll probably confirmed that

18  with him.  But that's probably, I would imagine, how

19  that kind of went down.  Because Mike was really -- Mike

20  was really excited about, you know, this hire because he

21  -- he had just -- just become the president and, you

22  know, was excited to grow the company.  So he -- he was

1    very excited about this hire. So I would imagine

2    probably a combination of those two but more

3    specifically probably came from Sean.

4        Q.   All right. At this point in time, October

5    11th, what was your purpose in confirming these numbers

6    with Mr. Johnson?

7        A.   We were working on his offer letter. And then

8    the offer letters for other L.O.'s on this team.

9        Q.   How do these numbers affect Mr. Johnson's

10   offer letter?

11       A.   The more volume you close, the more money you

12   get.

13       Q.   In the offer?

14       A.   Correct.

15       Q.   Okay. How do these figures affect the offers

16   for other loan officers?

17       A.   Same. Same way. It was -- it was real common

18   during COVID. Obviously, these numbers -- the numbers

19   were really good because interest rates were so low. So

20   it was very common within the mortgage industry to write

21   large checks to production teams to come over to the

22   company. It was -- I mean it's -- it -- every company

1    Q.  Did Mr. Johnson give you guidance about what

2  would be effective in recruiting the other LoanDepot

3  employees?

4    A.  Maybe a little bit.  It was pretty much a -- a

5  kind of a done deal.  Like it was -- it -- it had

6  happened behind the scenes.  I wasn't even, you know, I

7  wasn't a part of it.  So it was -- not really.  I mean,

8  I'm -- I'm sure there was some conversation of here's,

9  you know, here's so and so's hot buttons.  But, you

10  know, quite frankly, there wasn't a ton of -- there

11  wasn't a ton of recruiting going on.  It was kind of a

12  done deal.

13    Q.  Okay.  What do you mean when you say that it

14  was happening behind the scenes?

15    A.  Meaning Sean was leaving and the team was

16  following him.

17    Q.  And as meaning, you -- he was having

18  conversations with him about that?

19    A.  Correct.

20    Q.  Did Mr. Johnson tell you that he was having

21  conversations with his team about --

22    A.  He didn't need -- no, he didn't need to.  But

1   good up to the point mid to late 2020, correct?

2        A.   Somewhere in there.

3        Q.   All right.  And you said at that point, he

4   became disinterested, meaning he was preoccupied with

5   other activities, correct?

6        A.   Among other things, yes.

7        Q.   Okay.  And you said at points you didn't feel

8   like you were getting support from him.  Fair?

9        A.   Yes.

10       Q.   All right.  And you felt like you didn't

11  follow up on certain initiatives that you had agreed on?

12       A.   Follow up on certain issues and follow through

13  on commitments he made to loan officers.

14       Q.   Okay, all right.  So in terms of leaving

15  LoanDepot, that relationship with Mr. Covey prompted you

16  to entertain communications from Movement about a job.

17  Fair?

18       A.   Several companies, but yes.

19       Q.   Okay.  Well, I mean, let's maybe be more

20  specific about it.

21       So there came a time when you got into contact with

22  Mike Brennan, the CEO of the Movement, right?

1          A.    Yes.

2          Q.    And I asked you about that in your deposition,

3     and you couldn't recall whether he called you or you

4     called him, right?

5          A.    If that's what the deposition was, yes.

6          Q.    Okay.  So somehow on October 5th, you connect

7     up with Mike Brennan, right?

8          A.    Yes.

9          Q.    And that's October 5, 2021?  So I get my years

10    right.

11         A.    Yeah.  I believe that's what it was, yes.

12         Q.    Correct?  All right.  Now, it was at that

13    point you engaged with him about potentially leaving

14    LoanDepot, correct?

15         A.    We had a brief conversation, and then he

16    pointed me to Chris Shelton.

17         Q.    Right.  All right.  Well, let's take a look at

18    Exhibit 13.  That's LoanDepot Exhibit 13.

19         (Whereupon, Respondent Exhibit 13 was marked for

20    identification.)

21         You there?

22         A.    Yes, sir.

1      Q.   All right.  So just to put a finer point on

2   it, so this is the text that you exchanged with Mr.

3   Brennan on October 5, 2021, correct?

4      A.   It is.

5      Q.   And you'd not been in touch with Mr. Brennan

6   over the years, right?

7      A.   No.

8      Q.   All right.  And I think you said you knew him

9   maybe in passing back at Movement when you were there?

10     A.   At different events.

11     Q.   Okay.  So you get this communication out of

12  the blue with Mr. Brennan and so as a result of that,

13  then this series of events starts which lead to your

14  ultimately resigning from LoanDepot, correct?

15     A.   Yes.

16     Q.   Okay.  So that whole process from the time

17  let's say you first connected with Mr. Brennan on

18  October 5th to the time you got an offer letter from

19  Movement, which was on -- do you remember when that was?

20  Was it October '21.  Does that sound about right?

21     A.    '21, '22 something like that, yeah.

22     Q.   Okay.  I'll represent to you it was October

1     A     For his own reasons.

2     Q     So apparently there was something going on

3   at Movement such that he felt it necessary to leave;

4   right?

5     A     I think we covered that earlier.

6     Q     I'm asking you now, yes or no.  Was there

7   something going on for Mr. Walker sufficient such

8   that he felt the need to leave Movement?

9     A     My understanding is the local leadership

10  there had left.

11    Q     And Lisa West, there was something going

12  on there at Movement sufficient enough to make --

13  have her make the weighty decision to leave that

14  job; right?

15    A     She took an opportunity in the real estate

16  business.

17    Q     And she left Movement?

18    A     She did, yeah.

19    Q     Okay.  Same thing with Justin Kozera;

20  right?  There was enough going on there that he

21  decided he was going to leave Movement; right?

22    A     Opportunity.

1    Q    Okay.  So -- and I know we talked a lot

2  about this Charlotte meeting.  So in that Charlotte

3  meeting, you had understood even before the

4  Charlotte meeting that you were not going to be a

5  produce at Movement; correct?

6    A    I wasn't sure I was going to be taking a

7  job at Movement before the Charlotte meeting, but

8  the likelihood it would be a nonproducing role.

9    Q    But any job that you were discussing from

10 the get-go, the time you talked to Mr. Brennan on

11 October 5, that was from that point to be a

12 nonproducer role; correct?

13   A    More than likely, yes.

14   Q    And so as you got to Charlotte, I think

15 what you said was that the discussion was at that

16 time around your being in the nonproducer role,

17 taking over as the regional director.  Did I get

18 that right?

19   A    That's what most conversations were, yes.

20   Q    And so when you were in Charlotte, I think

21 you said that you met primarily with Mr. Brennan and

22 then with Mr. Shelton; right?

1      A    Yep.

2      Q    Okay.  And so Jason Stenger as the chief

3   operations officer, he's the one responsible for

4   ensuring that loans within Movement can be processed

5   on the operations side efficiently and effectively;

6   right?

7      A    Yes.

8      Q    So he's the guy that makes the loan trains

9   run on time; fair enough?

10     A    He does.

11     Q    Okay.  And so someone like Jason Stenger

12  would need to get involved when, for example, a

13  large group of employees were coming on, let's say

14  in an acquisition, okay.  Do you know whether

15  Movement has been involved in any acquisitions?

16     A    They acquired Mortgage Network I think

17  early '22.

18     Q    Okay.

19     A    And Eagle Bank like six years ago, I

20  guess.

21     Q    Let's go with Mortgage Network, then.  So

22  Mortgage Network, when Movement acquired Mortgage

1 business that they are able to handle can get

2 processed effectively; right? Yes?

3     A    That was not part of the conversation.

4     Q    I'm not asking if that was part of the

5 conversation. I'm asking you, based on what you

6 know about your employment with Movement and being

7 in the industry for how many years?

8     A    23.

9     Q    23. So for being in the industry for 23

10 years, you know that when a group of people is

11 brought on, you've got to have the operational

12 support there to ensure that the volume that they

13 bring in can be handled; right?

14     A    When one person comes on, you've got to

15 make sure the operational support is there.

16     Q    When one person comes in. And it's a lot

17 different when a group of people comes in; right?

18     A    There's different challenges.

19     Q    So when a group of people comes in, like

20 when mortgage network comes in, that's the type of

21 thing that Jason Stenger, the chief operations

22 officer, would be involved in; right?

1    A    He would make sure he had the right staff

2    deployed.

3    Q    Exactly.  So you're not going to bring in

4    a group of people who are loan officers, going to

5    sell loans, without the ability to support them from

6    the operational side; right?

7    A    Yes.

8    Q    All right.  That's right.

9         And so you don't need that type of

10    infrastructure when one nonproducer is coming in;

11    right?

12    A    Incorrect.

13    Q    Right -- oh.  So well, when one

14    nonproducer is coming in with loan officers you do;

15    right?

16    A    Incorrect.

17    Q    All right.  Now, we talked a little bit

18    about the communications that you had with the

19    people in your office, and I want to make sure I get

20    this right.

21         So you said, and maybe I'll say it

22    differently.  So is it the case that when you got

**breaks** 138:3
306:1
**bree** 2:16
358:15 765:12
1137:14
1387:3 1766:3
**breeze** 1051:12
**brennan** 13:13
13:13,16,17
14:3 15:16
18:2 54:7,7,11
57:1 61:20
74:1,16 76:2
79:17 80:9
83:20 91:15
92:3 94:4
102:14,20
104:8,11
112:10 113:11
113:12 186:7
332:22 333:7
334:3,5,12,17
335:4,9 336:2
336:11 343:14
345:16 350:21
389:13 453:3
454:5 963:10
963:11
1027:10,21
1034:6,17,18
1035:7
1247:22
1251:13
1252:9,21
1253:12,22

1257:18
1478:3
1480:14
1484:10
1487:1 1519:2
1563:6
**brennan's** 80:1
**brentwood**
1456:19
**brett** 184:9
**brian** 12:9
33:22 34:14
37:15 38:12
43:1 45:9
226:7 330:4
360:5 410:17
412:17 468:11
468:22 474:12
474:14 497:4
502:17 518:5
518:11 590:3,5
679:18 680:11
743:5,15
905:15 906:19
906:20 907:4,7
908:7 927:6,8
927:18 929:1,5
929:13 930:21
934:1 961:15
961:16 968:8,8
968:9,11,13,15
970:10 978:2,5
999:18 1005:7
1018:21
1051:17

1086:21
1092:7 1093:8
1102:19
1105:2
1163:16
1279:6 1280:5
1281:20
1282:13,22
1283:14
1286:16
1287:19
1296:15,17
1298:21
1327:22
1328:5,10
1333:21
1335:5 1378:7
1378:10,13,13
1378:20
1398:10
1399:7,18
1435:8 1436:2
1436:13,19
1437:4,7,8,10
1451:18
1452:14,19
1453:2,3,8
1463:2,9,22
1465:11,19
1466:11,15
1467:22
1475:14
1497:19
1499:8 1500:3
1500:4

1501:22
1503:5 1526:3
1538:12
1554:9
1556:19
1564:17
1566:1,2,6,7
1568:3 1569:9
1569:20
1586:21
1587:12,13,20
1588:19
1596:18
1597:6
1615:13
1629:15
1651:8,11,18
1652:4
1660:14
1666:8
1669:16,17
1671:4,4
1695:15
1700:17
1708:16,20
1709:10
1743:22
1744:3,8
1760:8
1767:13
1769:11
1841:21
1844:6 1845:5
1864:2,7
1871:8 1884:3

1504:7
1560:10
1564:13
1583:5
1588:16
1591:5
1593:17
1605:13
1616:6,6
1645:10
1653:10,12,19
1654:3
1669:18
1670:4,11
1672:14,20
1673:1,17
1677:11,15
1678:5 1681:8
2082:18
**stayed** 597:9
795:3,6 797:3
836:12 838:1
868:9 885:21
922:17 962:3
1012:7 1220:6
1296:10
1300:1 1328:2
1356:7
1460:15
1496:22
1539:3 1563:5
1563:10
1580:10
1583:20
1645:3,4,10

1648:18
1669:22
1677:13
1748:15
2042:17
2064:21,21
**staying** 35:8
580:17 585:11
593:13 594:1
796:9 824:13
826:17 827:10
1328:4
1421:14
1503:15
1654:1
1669:14
2203:15
**stays** 322:19,21
705:3
**steak** 1328:12
1328:20
1345:12
1348:11,19
1366:15,16,22
1368:7 1369:5
1409:11
1411:5,8
**steeper** 976:4
**steered** 1166:2
1538:9,20
**steering**
1165:19,20
**stenger** 112:18
1028:11
1029:2,11

1030:8
1031:21
1058:20
1484:10
1487:1 1519:3
1519:7
**stenotype**
1384:7 1763:7
2214:6
**stenotypy**
762:7
**step** 72:21
148:17 171:10
567:10,10
702:8 730:17
812:14 856:18
901:17 976:20
1731:5
1906:15
2055:20
2069:9
**stephen** 696:10
697:10
**stepped** 946:5
1500:17
1728:21
**stepping** 89:15
89:18 513:7
595:18
**steps** 214:19
567:1,3 1397:5
1926:15
**sterling** 945:11
1682:22

**steve** 920:12
936:12
1236:15
1238:2 1278:3
1475:22
1477:1,9
1478:18
1480:7 1486:4
1515:18,19
1607:21
**steven** 1958:7
**stick** 338:12
521:5 738:12
777:3 1449:9
1726:16
**stickiest** 951:21
952:7
**sticking** 588:15
**sticks** 807:19
**sticky** 931:20
952:15,19
**stimulate**
1155:14
1183:8
**stint** 55:8,13
126:21 986:10
1220:17
1349:7
1471:20
1479:11
1518:6
**stints** 1512:4
**stipulate**
1962:5